FILED IN
COURT OF CRIMINAL APPEALS

February 6, 2015

ABEL ACOSTA, CLERK

AP-77,039
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 2/5/2015 3:02:57 PM
Accepted 2/6/2015 8:59:58 AM
ABEL ACOSTA
CLERK

NO. AP-77039

_____

# IN THE TEXAS COURT OF CRIMINAL APPEALS

_____

## JEFFREY KEITH PREVOST
### VS.

## THE STATE OF TEXAS

_____

Capital Murder Conviction on Appeal from the
District Court of Harris County, Texas
351st Judicial District
Cause No. 1414421

_____

**APPELLANT'S BRIEF**

_____

APPELLANT WAIVES
ORAL ARGUMENT

DOUGLAS M. DURHAM
State Bar Number:06278450
2800 Post Oak Blvd. Suite 4100
Houston, Texas 77002
(832)390-2252 Telephone
(832)390-2350 Facsimile
ATTORNEY FOR APPELLANT
JEFFREY KEITH PREVOST

## IDENTITY OF PARTIES AND COUNSEL

Pursuant to Tex.R.App.P. 38.1(a), the following is a list of all interested parties in this cause:

1.    JEFFREY KEITH PREVOST- Defendant/Appellant

2.    R. P. "Skip" Cornelius
      State Bar No. 04831500
      Laura Duemer Cornelius
      State Bar No. 04831200
      Defendant/Appellant's Trial Counsel
      2028 Buffaloe Terrace
      Houston, Texas 77019

3.    Allen Tanner
      State Bar No. 19637100
       Defendant/Appellant's Trial Counsel
      917 Franklin Street, Suite 550
      Houston, Texas 77002

3.    DOUGLAS M. DURHAM - Appellate Counsel for Defendant/Appellant
      State Bar No. 06278450
       Defendant/Appellant's Counsel on Appeal
       2800 Post Oak Blvd. Ste. 4100
      Houston, Texas 77056

4.    Devon Anderson- District Attorney for Harris County, Texas
      1201 Franklin, Suite 600
      Houston, Texas 77002

5.    Anna Emmons - Assistant District Attorney for Harris County, Texas
      1201 Franklin, Suite 600
      Houston, Texas 77002

6.    Craig Goodhart- Assistant District Attorney for Harris County, Texas
      1201 Franklin, Suite 600

Houston, Texas 77002

7.     Allan Curry, Chief Appellate Division
District Attorney's Office for Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002

____/s/_____
DOUGLAS M. DURHAM
2800 Post Oak Blvd. Ste. 4100
Houston, Texas 77056

# TABLE OF CONTENTS

Page

Identity of Parties and Counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Index of Authorities (Cases). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Constitutions and Statues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement Regarding Oral Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

Questions Presented. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

WHETHER THE STATE'S FAILURE TO FILE WRITTEN NOTICE OF "INTENT TO SEEK THE DEATH PENALTY" VIOLATES DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENT?

WHETHER THE STATE'S FAILURE TO FILE WRITTEN NOTICE OF "INTENT TO SEEK THE DEATH PENALTY VIOLATES DUE COURSE OF LAW UNDER ARTICLE ONE, SECTION NINETEEN OF THE TEXAS CONSTITUTION?

WHETHER THE STATE'S FAILURE TO FILE WRITTEN NOTICE OF "INTENT TO SEEK THE DEATH PENALTY" AS REQUIRED BY LAW WAS FUNDAMENTAL ERROR?

WHETHER THE TRIAL COURT ERRED BY FAILING TO FIND TEXAS CODE OF CRIMINAL PROCEDURE ARTICLE 37.071 UNCONSTITUTIONAL?

WHETHER THE TRIAL COURT ERRED BY FINDING TEXAS PENAL CODE ART. 19.02-19.03 UNCONSTITUTIONAL?

WHETHER THE EXCUSAL OF PROSPECTIVE JUROR 77 (WILLIAM HERED) BASED ON THE STATE'S CHALLENGE FOR CAUSE (OVER DEFENSE OBJECTION) WAS ERROR BY THE TRIAL COURT?

WHETHER THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR A MISTRIAL AFTER THE ADMISSION OF IMPROPER EXTRANEOUS OFFENSE EVIDENCE?

WHETHER THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR A MISTRIAL AFTER THE ADMISSION OF VICKI ALEXANDER'S UNRESPONSIVE AND PREJUDICIAL TESTIMONY?

WHETHER THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR A MISTRIAL AFTER THE ADMISSION OF THOMESA HOLLIN'S UNRESPONSIVE AND PREJUDICIAL TESTIMONY?

WHETHER THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR A MISTRIAL AFTER THE ADMISSION OF AN IMPROPER AND PREJUDICIAL QUESTION BY THE PROSECUTOR?

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Point of Error One. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

THE STATE'S FAILURE TO FILE WRITTEN NOTICE OF "INTENT TO SEEK THE DEATH PENALTY" VIOLATES DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENT

Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .46

Point of Error Two. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

THE STATE'S FAILURE TO FILE WRITTEN NOTICE OF "INTENT TO SEEK THE DEATH PENALTY VIOLATES DUE COURSE OF LAW UNDER ARTICLE ONE, SECTION NINETEEN OF THE TEXAS CONSTITUTION

Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .46

Point of Error Three.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

> THE STATE'S FAILURE TO FILE WRITTEN NOTICE OF "INTENT TO SEEK THE DEATH PENALTY" AS REQUIRED BY LAW WAS FUNDAMENTAL ERROR

Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .47

Point of Error Four . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .48

> THE TRIAL COURT ERRED BY FAILING TO FIND TEXAS CODE OF CRIMINAL PROCEDURE ARTICLE 37.071 UNCONSTITUTIONAL

Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .48

Point of Error Five.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

> THE TRIAL COURT ERRED BY FINDING TEXAS PENAL CODE ART. 19.02-19.03 UNCONSTITUTIONAL

Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .49

Point of Error Six.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

> THE EXCUSAL OF PROSPECTIVE JUROR 77 (WILLIAM HERED) BASED ON THE STATE'S CHALLENGE FOR CAUSE (OVER DEFENSE OBJECTION) WAS ERROR BY THE TRIAL COURT

Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50

Point of Error Seven . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

> THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR A MISTRIAL AFTER THE ADMISSION OF IMPROPER EXTRANEOUS OFFENSE EVIDENCE

Factual Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .54

Point of Error Eight . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

    THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION
    FOR A MISTRIAL AFTER THE ADMISSION OF VICKI ALEXANDER'S
    UNRESPONSIVE AND PREJUDICIAL TESTIMONY

Factual Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .57

Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .58

Point of Error Nine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

    THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION
    FOR A MISTRIAL AFTER THE ADMISSION OF THOMESA HOLLIN'S
    UNRESPONSIVE AND PREJUDICIAL TESTIMONY

Factual Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .62

Point of Error Ten . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

    THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION
    FOR A MISTRIAL AFTER THE ADMISSION OF AN IMPROPER AND
    PREJUDICIAL QUESTION BY THE PROSECUTOR

Factual Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .63

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .64

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .65

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

# INDEX OF AUTHORITY
## (CASES)

Page

*Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).. . . . . . . . . . . . . .47

*Apprendi v. New Jersey,* 530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 51

*Brooks v. State*, 847 S.W.2d 247 (Tex. Crim. App. 1993) . . . . . . . . . . . . . . . . . . 48

*Byrd v. State,* 2008 Tex. App. LEXIS 6630 (Tex. App. - Forth Worth 2008). . . . .50

*Clark v. State,* 365 S.W.3d 333 (Tex. Crim. App. 2012) . . . . . . . . . . . . . . . . . . . 47

*Coker v. Georgia,* 433 U.S. 584 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Ex parte Patterson*, 740 S.W.2d 766 (Tex. Crim. App. 1993). .. . . . . . . . . . . . . 48

*Ex parte Watkins*, 489 S.W.2d 617, 618 (Tex. Crim. App. 1973) . . . . . . . . . . . . .47

*Flores v. Johnson,* 201 F.3d 456 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . .4, 6

*Hill v. State*, 817 S.W.2d 816 (Tex. App.– Eastland 1991). . . . . . . . . . . . . . . . . . 62

*Jones v. United States*, 566 U.S. 227 (1999). . . . . . . . . . . . . . . . . . . . . . . . 3, 5,50

*Moraguez v. State*, 701 S.W.2d 902 (Tex. Crim. App. 1986). . . . . . . . . . . . . . . . 3

*Mullaney v. Wilbur*, 421 U.S. 684 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 52

*Perry v. State*, 158 S.W.3d 438 (Tex. Crim. App. 2004). . . . . . . . . . . . . . . . . . . .51

*Smith v. State*, 2012 Tex. App. LEXIS 10056 (Tex. App. - Fort Worth 2012) . . . .48

*State v. ex rel Lykos v. Fine,* 330 S.W.3d 904 (Tex. Crim. App. 2011). . . . . . . . . 49

## CONSTITUTIONS AND STATUTES <span style="float:right">Page</span>

TEX. PENAL CODE § 19.03(a)(8).. . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

TEX. CODE OF CRIM. PRO.  § 1.14. . . . . . . . . . . . . . . . . . . . . . . . . . . .49

TEX. CODE OF CRIM. PRO.  § 37.01. . . . . . . . . . . . . . . . . . . . . . . . . . . 3

TEX. CODE OF CRIM. PRO.  § 37.071. . . . . . . . . . . . . . . . . . . . . . . . . . 3

U. S. CONST. AMEND. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v, 46

U. S. CONST. AMEND. VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

U. S. CONST. AMEND. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v, 46

NO. AP-77039

_____

IN THE TEXAS COURT OF
CRIMINAL APPEALS

_____

JEFFREY KEITH PREVOST

VS.

THE STATE OF TEXAS

_____

Capital Murder Conviction on Appeal from the
District Court of Harris County, Texas
351st Judicial District
Cause No. 1414421

_____

**APPELLANT'S BRIEF**

_____

TO THE HONORABLE JUDGES OF THE COURT OF CRIMINAL APPEALS:

COMES NOW, JEFFREY KEITH PREVOST, Appellant in the above styled and numbered cause and would respectfully show the Court as follows:

**<u>PRELIMINARY STATEMENT</u>**

This is an appeal from a sentence of death for the offense of Capital Murder as proscribed by Section 19.03(a)(8) of the Texas Penal Code. A Harris County grand jury returned a one paragraph indictment on the 15th day of February 2014. (CR-I-002). The first paragraph [omitting the formal parts] alleged that:

1

"JEFFREY KEITH PREVOST, hereafter styled the Defendant, on or about May 20, 2011, did then and there unlawfully, during the same criminal transaction, intentionally and knowingly cause the death of SHERRY WHITE, by shooting SHERRY WHITE with a deadly weapon, to wit: a firearm, and by stabbing SHERRY WHITE with a deadly weapon, to wit: a knife, and intentionally and knowingly cause the death of KYLE LAVERGE, by shooting KYLE LAVERGE with a deadly weapon, to wit: a firearm. (CR-I; p. 12).

On March 24, 2014, a jury found defendant guilty of Capital Murder. (XIX- p. 7). On April 5, 2014, the jury unanimously found beyond a reasonable doubt that the answer to special issue one (1) was "yes" and the answer to special issue two (2) was "no" the Court order Appellant punishment at death. (CR-VII; p. 1502-1503 and RR-XXX-p. 3-4). Notice of Appeal was timely filed on April 5, 2014. (CR-VII; p. 1504-1506). The Court certified Appellant's right to Appeal on April 5, 2014. (CR-VII; p. 1507).

## STATEMENT OF FACTS

### (i) PRELIMINARY MATTERS

From on or about May 11, 2011 through April 2, 2014 the Defense filed various pre-trial motions, including but not limited to: 1) Motions for Psychiatric Examination to determine both Competency and Sanity; [CR-I; p. 7-9]; 2) Motion for appointment of an Investigator; [CR-I; p. 31]; 3) Motions in Limine;[CR-I; p.59]; 4) Motion to Suppress evidence; [CR-I; p. 67-69]; 5) Various Motions for Discovery; [CR-I; p. 69-77; p. 136; p. 140]; 6) Motion for Hearing on Admissibility

2

of any statement by The Defendant Whether Written Or Oral or Evidence resulting from same; [CR-I; p. 094]; 7) Motion to Suppress Confession[1]; [CR-I; p. 099]; 8) Motion to preclude the death penalty as a sentencing option and to declare Texas Code of Criminal Procedure Article 37.071 unconstitutional citing *Jones v. United States* 566 U.S. 227 (1999); *Apprendi v. New Jersey*, 530 U.S. 466 (2000); and *Ring v. Arizona*, 536 U.S. 584 (2002). [CR-I; p.103]; 9) Motion to Declare the Texas Penal Code Sections 19.02-19.03 Unconstitutional Under the *Eighth Amendment* and citing *Mullaney v. Wilbur,* 421 U.S. 684 (1975). [CR-I; p. 110]; 10) Motion to Preclude the offer of Extraneous Offenses. [CR-I; p. 117]; 11) Motion for Jury Instructions to Inform Jurors of Result of Life Sentence if they can't answer any special issue.  [CR-I; p. 125]; 12) Motion to List Witnesses and Request for Criminal Histories. [CR-I; p.151]; 13) Motion to Propound specific questions to Veniremen re: Burden of Proof on Special Issue: Mitigation. [CR-I; p.164]; 14) Motion to Declare the Statutory Definition of Mitigating Evidence Unconstitutional. [CR-I; p. 168];15) Motion to hold Tex. Code of Criminal Procedure Art. 37.01 and Art. 37.071

---

[1]     The Motion to Suppress Confession was filed without an Order. (CR-I; p. 67-69). There was no hearing on the Motion to Suppress. (RR-I-XXXIX).  Further, the audio and video recording of Appellant's interrogation where he described killing the two victims (State's Exhibit 197) was admitted into evidence with Allen Tanner stating "no objection." (RR-XXI; p. 148). This waives any error regarding issues of admissibility previously raised in the Motion to for Hearing on Admissibility of any statement or in Motion to Suppress. See *Moraguez v. State*, 701 S.W.2d 902 (Tex. Crim. App. 1986).

3

sec. 2(a)Unconstitutional Wherein Prosecutor Have Unfettered Discretion To Seek Death Penalty. [CR-I; p. 186; p. 199; p.1413];16) Motion to Hold Art. 37.071 Unconstitutional citing *Flores v. Johnson*, 210 F.3d 456 (5th Cir. 2000)[CR-I; p. 186]; 17) Motion to Declare Art. 37.071 Facially Unconstitutional for Vagueness [CR-I; p. 199]; 18) Motion Requesting Instruction to the Jury Regarding Residual Doubt as Mitigation and Order of the Court. [CR-I; p. 244].

## (ii) PRELIMINARY ORDERS BY COURT

On May 24, 2011, the Court entered orders granting the Appellant's Motions for Psychiatric Evaluations for both Competency and Sanity. (CR-I; p. 10 and p. 42). On or about June 29, 2011, Appellant was interviewed by *Stephen P. McCary* Phd., a clinical psychologist, who determined that Appellant was both *competent* to stand trial and *sane* at the time of the offense. (CR-I; p. 43-47 and p. 48-52). On that same day, Dr. McCrary diagnosed [following the DSM-IV-TR (2000)] Appellant with a "mood disorder not otherwise specified" with "delusional and jealous type" features. (CR-I; p. 46 and p. 51). On January 6, 2014, the Court granted Appellant's Motion to appoint an investigator.[2] (CR-I; p. 32). On February 17, 2014, the Court denied Appellant's Motion to Preclude the Death Penalty as a Sentencing Option And to

---

[2]     Buddy Sledge, Private Investigator License No. A13785 was appointed and to be compensated by the Treasurer of Harris County, Texas. (CR-I; 32).

4

Declare Tex. Code of Crim. Pro. 37.071 Unconstitutional citing *Jones v. United States* 566 U.S. 227 (1999); *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Ring v. Arizona*, 536 U.S. 584 (2002). (CR-I; p. 109). On February 17, 2014 the Court denied Appellant's Motion to Declare the Texas Penal Code Sections 19.02-19.03 Unconstitutional Under the *Eighth Amendment* citing *Mullaney v. Wilbur,* 421 U.S. 684 (1975). (CR-I; p. 116). On February 17, 2014 the Court denied Appellant's Motion to Preclude the offer of Extraneous Offenses (CR-I; p. 124). On February 17, 2014 the Court denied Appellant's Motion for Jury Instructions to Inform Jurors of Result of Life Sentence if they can't answer any special issue then the Defendant will be given Life in Prison. (CR-I; p. 127). On March 7, 2014 the Court granted Appellant's Motion to List Witnesses and Request for Criminal Histories. (CR-I; p. 163). On February 17, 2014 the Court denied Appellant's Motion to Propound specific questions to Veniremen re: Burden of Proof on Special Issue: Mitigation. (CR-I; p.167). On February 17, 2014 the Court denied Appellant's Motion to Declare the Statutory Definition of Mitigating Evidence Unconstitutional. (CR-I; p. 176). On February 17, 2014 the Court denied Appellant's Motion to hold Tex. Code of Criminal Procedure Art. 37.01 and Art. 37.071 sec. 2(a)Unconstitutional Wherein Prosecutor Have Unfettered Discretion To Seek Death Penalty.(CR-I; p. 189). On February 17, 2014 the Court denied Appellant's Motion to Hold 37.071

Unconstitutional citing *Flores v. Johnson*, 210 F.3d 456 (5ᵗʰ Cir. 2000). (CR-I; p. 205). On February 17, 2014 the Court denied Appellant's Motion to Declare Art. 37.071 Facially Unconstitutional for Vagueness. (CR-I; p. 212). On February 17, 2014 the Court denied Appellant's Motion Requesting Instruction to the Jury Regarding Residual Doubt as Mitigation and Order of the Court. (CR-I; p. 247).

## (iii) JURY SELECTION PHASE OF TRIAL

On February 17, 2014 the jury selection phase of the trial began. (RR-III; p. 4). The first panel of one hundred and twenty (120) prospective jurors were summoned to the 351ˢᵗ District Court, assigned numbers from one (1) to one hundred and twenty (120). (RR-III; p. 1-276). One hundred and nineteen (119) jurors arrived and were seated. (RR-III; p. 5 and p. 137). Juror number 94 failed to appear and a *capias* was issued. (RR-III; p. 137). The parties excused thirty-one (31) prospective jurors by agreement[3] after review of juror questionnaires. (RR-III; p.4; p. 222 and p. 225). Thereafter, the Judge conducted his general "voir dire" of the first venire panel wherein he explained certain principles of law.[4] (RR-III; p. 4-51). During the Court's

---

[3]     The parties excused by *agreement* the following prospective jurors from the panel numbered one (1) to one hundred twenty (120) as follows: 10; 20, 25, 29, 32, 36, 38, 40, 42, 52, 57, 60, 63, 67, 68, 69, 70, 71, 72, 87, 88, 89, 90, 93, 99, 101, 108, 112, 113, 118 and 120. (RR-III; p. 4-5 and p. 225). Juror 58, having qualified to serve, was instructed to return on February 18, 2014 due to a schedule conflict. (RR-III; p. 4-5).

[4]     The Court discussed the following principles of law including but not limited to: 1) the presumption of innocence; 2) that a grand jury indictment is no evidence of guilt; 3) that the State has burden of proof and it never shifts to the Defendant; 4) the principle that the State

general voir dire, forty-seven (47) additional prospective jurors were excused[5]. (RR-III; 222-225). Forty-two (42) jurors were instructed to return on various dates for individual voir dire[6]. (RR-III; 226-229). On February 18, 2014, a second panel of one hundred and twenty prospective jurors were summoned to the 351st District Court. (RR-IV; p. 1-234). All one hundred and twenty (120) summoned jurors arrived and were seated according to their assigned numbers from one hundred twenty-one (121) to two hundred and forty (240). (RR-IV; p. 1-234). In addition, juror number 58 also appeared as ordered by the Court on February 17, 2014. (RR-III; 4-5 and RR-IV; p. 81).The parties excused sixty-eight (68) prospective jurors by agreement[7] after review of juror questionnaires. (RR-IV; p. 81, p. 132 and p. 187).

---

must prove the accused's guilt beyond a reasonable doubt; 5) the accused has the Fifth Amendment Right against self-incrimination and should he exercise that right, no juror may draw an adverse inference there from; 6) explanation of grand jury process; and 7) the elements of the indictment. (RR-III; p. 39-52).

[5]     The Court excused (agreed to by both parties) prospective jurors numbered 2-7; 9; 15; 17; 24; 28; 30; 31; 33; 37; 39; 41; 43; 44; 46; 47; 50; 51; 54; 59; 62; 65; 66; 74; 75; 78; 80; 84; 91; 95-97; 100; 106;107; 110;111;115; 116; 119. (RR-III; p. 222 and 225).

[6]     Jurors numbered 1, 8, 11, 12 and 13 were told to return for individual voir dire on 2/19/2014 at 8:30 am; Jurors 14, 16, and 18 on 2/19/2014 at 1:00 p.m.; Jurors 19, 21, 22, 23, and 26 on 2/20/2014 at 8:30 a.m.; Jurors 27, 34, 35 at 1:30 p.m. on 2/20/2014; Jurors 45, 48; 49; 53, and 55 at 8:30 a.m. on 2/21/2014; Jurors 56 and 61 at 1:00 p.m. on 2/21/2014; Jurors 64, 73, 76, 77, and 79 at 8:30 a.m. on 2/24/2014; Jurors 81, 82 and 83 at 1:00 p.m. on 2/24/2014; Jurors 85, 86, 92, 98 and 102 at 8:30 a.m. on 2/25/2014; Jurors 103, 104, and 105 at 1:00 p.m. on 2/25/2014; Jurors 109, 114, and 117 at 8:30 a.m. on 2/26/2014. (RR-III; 226-229).

[7]     The parties excused by *agreement* the following prospective jurors from the second panel numbered one hundred twenty-one (121) to two hundred and forty (240) as follows: 58; 122; 124; 126; 127; 132; 133; 137; 138; 140-148; 150; 152-155; 159; 162; 164; 166; 167;

Thereafter, the Judge conducted his general "voir dire" of the second venire panel wherein he explained general principles of criminal law.[8] (RR-IV; p. 34-201). Forty-nine (49) prospective jurors were instructed to return on various dates for individual voir.[9] On February 19, 2014, eight prospective Jurors were questioned individually.[10]

171-174; 176; 177; 179; 182; 183; 186; 187; 190-193; 195; 199-201; 204; 205; 208; 209; 213; 214; 216;217; 219-224; 226; 229; 232-234;238; 239. (RR-IV; p. 81, p. 132 and p. 187).

[8] The Court discussed the following principles of law including but not limited to: 1) the presumption of innocence; 2) that a grand jury indictment is no evidence of guilt; 3) that the State has burden of proof and it never shifts to the Defendant; 4) the principle that the State must prove the accused's guilt beyond a reasonable doubt; 5) the accused has the Fifth Amendment Right against self-incrimination and should he exercise that right, no juror may draw an adverse inference there from; 6) explanation of grand jury process; and 7) the elements of the indictment. (RR-IV; p. 34-201).

[9] Jurors numbered 94 and 121 were told to return on February 26, 2014 at 8:30 a.m. Jurors 123, 124, and 128 were told to return on February 26, 2014 at 1:00 p.m. (RR-IV; p. 202). Jurors numbered 129, 130, 131, 134 and 135 were told to return on February 27, 2014 at 8:30 a.m. Jurors 136, 139, and 149 were told to return on February 27, 2014 at 1:00 p.m. (RR-IV; p. 202). Jurors numbered 151, 156, 157, 158, and 160 were told to return on February 28, 2014 at 8:30 a.m. Jurors 161, 163, and 165 were told to return on February 28, 2014 at 1:00 p.m. (RR-IV; p. 203). Jurors 168, 169, 170, 175 and 178 were told to return on March 3, 2014 at 8:30 a.m. (RR-IV; p. 203). Jurors 180, 181 and 184 were told to return on March 3, 2014 at 1:00 p.m. Jurors 185, 188, 194, 196, and 197 were told to return on March 4, 2014 at 8:30 a.m. (RR-IV; p. 203). Jurors 198, 202, 203 were told to return on March 4, 2014 at 1:00 p.m. (RR-IV; p. 203). Jurors 206, 207, 210, 211, and 212 were told to return on March 5, 2014 at 8:30 a.m. (RR-IV; p. 203). Jurors 225, 227, 228, 231, 236 were told to return on March 6, 2014 at 8:30 a.m. (RR-IV; p. 203). Jurors 237 and 240 were told to return on March 6, 2014 at 1:00 p.m. (RR-IV; p. 203).

[10] Prospective Jurors 1, 8, 11, 12, 13, 14, 16, and 18 were questioned individually. (RR-V; p. 5-211). Prospective Juror 1 (Bobby Cox) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-V; p. 32). Prospective Juror 8 (Charles Kohler) was challenged for Cause by the Defense and it was granted. (RR-V; p. 39). Prospective Juror 11 (Tameka Hornsby) was challenged for Cause by the State (denied) and having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-V; p. 85). Prospective Juror 12 (Thomas Ryan) was excused by agreement. (RR-V; p. 88). Prospective Juror 13 (Angela Thompson) was excused on challenge for Cause by the State. (RR-V; p. 123). Prospective Juror

8

(RR-V; p. 5-211). On February 20, seven prospective Jurors were questioned individually.[11] (RR-VI; p. 5-289). On February 21, 2014 seven (7) prospective Jurors were questioned individually.[12] On February 24, 2014, eight (8) prospective Jurors were questioned individually.[13] (RR-VIII; p. 3-276). On February 25, 2014,

---

14 (Aaron Villarreal) was excused on challenge for Cause by the State. (RR-V; 128). Prospective Juror 16 (Angela Burroughs) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-V; p. 175). Prospective Juror 18 (Johnny Peek) was excused on challenged for cause by the Defense. (RR-V; p. 210).

[11]      Prospective Jurors 19, 21, 22, 23, 27, 34 and 35 were questioned individually. (RR-VI; p. 5-289). Prospective Juror 19 (Benjamin Rodriguez) was excused on challenged for Cause by both sides. (RR-VI; p. 11). Prospective Juror 21 (Priscilla DeGeorge) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-VI; p. 69). Prospective Juror 22 (Kaitlin Upchurch) was challenged for cause by the State which was granted. (RR-VI; p. 98). Prospective Juror 23 (Eric Moore) was excused on challenge for Cause by the Defense. (RR-VI; p. 140). Prospective Juror 27 (Tara Lloyd) was instructed to return on March 24, 2014 at 8:30 a.m. (RR-VI; p. 185). Prospective Juror 34 (David Blanchard) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-VI; p. 223). Prospective Juror 35 (Abraham Hernandez) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-VI; p. 259).

[12]      Prospective Jurors 45, 48, 49, 53, 55, 56 and 61 were questioned individually. (RR-VII; p. 5-198). Prospective Juror 45 (Michael Aliprando) was excused on challenge for cause by the State. (RR-VII; p. 11). Prospective Juror 48 (Christene Anderson) was excused by agreement of both parties. (RR-VII; p. 14). Prospective Juror 49 (Susan Weckwerth) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-VII; p. 62). Prospective Juror 53 (Julie Coe-Bohannon) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-VII; p. 106). Prospective Juror 55 (Rose Berlanga) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-VII; p. 147). Prospective Jurors 56 (Jay Seay) and 61(Marc Soriano) were excused by agreement. (RR-VII; p. 152 and p. 178).

[13]      Prospective Jurors 64, 73, 76, 77, 79, 81, 82, and 83 were questioned individually. (RR-VIII; p. 5-249). Prospective Juror 64 (Naomi Guzman) was excused by agreement. (RR-VIII; p. 6). Prospective Juror 73 (Darlena Greggs) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-VIII; p. 44). Prospective Juror 76 (Henrietta Cavanaugh) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m.

9

seven (7) prospective jurors were questioned individually.[14] (RR-IX; p. 3-158). On

February 26, 2014, nine (9) prospective jurors were questioned individually.[15] (RR-X; p. 3-288). On February 27, 2014, nine (9) prospective jurors were questioned

individually.[16] (RR-XI; p. 4-335). On February 28, 2014, eight (8) prospective jurors

---

(RR-VIII; p. 89). Prospective Juror 77 (William Hered) was excused over objection based on the State's Challenge for Cause. (RR-VIII; p. 121). Prospective Juror 79 (Kelly Kildart) was excused for Cause on Motions of both parties. (RR-VIII; p. 165). Prospective Juror 82 (Carolyn Hale) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-VIII; p. 208). Prospective Juror 83 (Olga Vasquez) was excused for Cause on Motion of the Defense. (RR-VIII; p. 248).

[14] Prospective Jurors 85, 92, 98, 102, 103, 104 and 105. (RR-IX; p. 3-158). Prospective Juror 85 (Lisa LeBlanc) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-IX; p. 102). Prospective Juror 92 (Thomas Berwick)was excused by agreement of both parties. (RR-IX; p. 5). Prospective Juror 98 (Linda Hendrickson) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-IX; p. 58-59). Prospective Juror 102 (Scott Huff). (RR-IX; p. 134). Prospective Juror 103(Joan Bolingbroke) was excused for Cause on Motion of Defense. (RR-IX; p. 157). Prospective Juror 104 (Jessica Jackson) was excused by agreement of both parties. (RR-IX; p. 5). Prospective Juror 105 (John Jones) was excused by agreement of both parties. (RR-IX; p. 5).

[15] Prospective Jurors 94, 109, 114, 117, 121, 123, 124, 128 and 225 were questioned individually. (RR-X; p. 3-261). Prospective Juror 94 (Kermit Stephens) was excused by the parties by agreement. (RR-X; p. 129). Prospective Juror 109 (Juanice Colwell) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-X; p. 60). Prospective Juror 114 (Omar Khan) was excused by agreement. (RR-X; p. 66-67). Prospective Juror 117 (Tamara Scott) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-X; p. 123). Prospective Juror 121(Lasonya Taylor) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-X; p. 170). Prospective Juror 124 (Visothik Chan) was excused by agreement. (RR-X; p. 218). Prospective Juror 128 (Kirk Nadler) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-X; p. 259). Prospective Juror 225 (Mechelle Maynes) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-X; p. 209).

[16] Prospective Jurors 129, 130, 131, 134, 135, 136, 139, 149, and 225 were questioned individually. (RR-XI; p. 4-302). Prospective Juror 129 (Jeanee Wells) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XI; p. 50).

10

were questioned individually.[17] (RR-XII; p. 3-155). On March 3, 2014, nine (9)

prospective jurors were questioned individually.[18] (RR-XIII; p. 3-273).  On March 4,

---

Prospective Juror 130 (Frances Baldwin) was excused on Motion of the Defense for Cause. (RR-XI; p. 86). Prospective Juror 131 (Deidre Richards) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XI; p. 136). Prospective Juror 134 (Glenn Price) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XI; p. 176). Prospective Juror 135 (Gaynell Watkins) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XI; p. 225).  Prospective Juror 136 (James Reed) was excused on Motion of the Defense for Cause. (RR-XI; p. 271). Prospective Juror 139 (Roberto Martinez) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XI; p. 296). Prospective Juror 149 (David Bankus) was excused by agreement. (RR-XI; p. 297).  Prospective Juror 225 (Shannon Thomason) was excused by agreement. (RR-XI; p. 302).

[17]      Prospective Jurors 151, 156, 157, 158, 160, 161, 163 and 165 were questioned individually. (RR-XII; p. 3-155). Prospective Juror 151 (Alecia Davis) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XII; p. 52). Prospective Juror 156 (Simone Elder) was excused on Motion of the Defense for Cause. (RR-XII; p. 55). Prospective Juror 157 (Robert Weidenmeyer) was excused by agreement. (RR-XII; p. 58). Prospective Juror 158 (Gloria McGlothen) was excused based on an age exemption. (RR-XII; p. 62). Prospective Juror 160 (Kimberly Hedman) was excused by agreement. (RR-XII; p. 68). Prospective Juror 161(Rashid Simmons)was excused by agreement. (RR-XII; p. 99).  Prospective Juror 163 (Barbara Lowry) was excused on Motion of the Defense for Cause. (RR-XII; p. 96).  Prospective Juror 165 (Kathleen Daniel) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XII; p. 134).

[18]      Prospective Jurors 168, 169, 170, 175, 178, 180, 181, 184, and 228. (RR-XIII; p. 3-245). Prospective Juror 168 (James Tullos) was excused on Motion of the Defense for Cause. (RR-XIII; p. 10). Prospective Juror 169 (Rita Townsley) was excused by agreement. (RR-XIII; p. 10). Prospective Juror 170 (Demond Stanley) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XIII; p. 47). Prospective Juror 175 (Angela Broussard ) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XIII; p. 100). Prospective Juror 178 (Gerard Lee) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XIII; p. 68). Prospective Juror 180 (Maru Stogner) was excused on Motion of the State for Cause. (RR-XIII; p. 207). Prospective Juror 181 (Elizabeth Jennings) was excused on Motion of the State for Cause. (RR-XIII; p. 208). Prospective Juror 184 (David Murff) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XIII; p. 245). Prospective Juror 228 (Cynthia Heldring) was excused by agreement. (RR-XIII; p. 144).

11

2014, eleven (11) prospective jurors were questioned individually.[19](RR-XIV; p. 3-397). On March 5, 2014, eight (8) prospective jurors were questioned individually.[20](RR-XV; p. 3-284). On March 6, 2014, a third panel of sixty four (64) prospective jurors were summoned to the 351st District Court. (RR-XVI; p. 3-160). All sixty-four (64) summoned jurors arrived and were seated according to their

---

[19] Prospective Jurors 185, 188, 196, 197, 198, 202, 203, 215, 231, 236 and 240 were questioned individually. (RR-XIV; p. 3-397). Prospective Juror 185 (Luann Hayes) was excused on Motion of the Defense for Cause. (RR-XIV; p. 46). Prospective Juror 188 (Demetria Thomas) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XIV; p. 90). Prospective Juror 196 (Russell Rice) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XIV; p. 141). Prospective Juror 197 (Robert Finley) was excused on Motion of the Defense for Cause. (RR-XIV; p. 169). Prospective Juror 198 (David Grimes) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XIV; p. 222 ). Prospective Juror 202 (Michael Yolland) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XIV; p. 311). Prospective Juror 203 (Cynthia Martinez) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XIV; p. 271). Prospective Juror 215 (Allison Hall) was excused by agreement. (RR-XIV; p. 171). Prospective Juror 231 (Linda Carraway) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XIV; p. 366). Prospective Juror 236 (Irasema Torres) was excused on Motion of the State for Cause. (RR-XIV; p. 389). Prospective Juror 240 (Gary Prezbinowski) was excused by agreement. (RR-XIV; p. 396).

[20] Prospective Jurors 194, 206, 207, 210, 211, 212, 218, and 227 were questioned individually. (RR-XV; p. 3-284). Prospective Juror 194 (Jhett Nelson) was excused on Motion of the State for Cause. (RR-XV; p. 239). Prospective Juror 206 (George Card) was excused on Motion of the Defense for Cause. (RR-XV; p. 94). Prospective Juror 207 (Gwendolyn Deason) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XV; p. 68). Prospective Juror 210 (Christina Dakus)having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XV; p. 148). Prospective Juror 211 (Michael Ducharme) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XV; p. 192). Prospective Juror 212 (Douglas Davis) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XV; p. 221). Prospective Juror 218 (David Valdez) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XV; p. 273). Prospective Juror 227 (Deborah Yahner) was excused by agreement. (RR-XV; p. 282).

assigned numbers from two hundred and forty one (241) to three hundred and three and five (305). (RR-XVI; p. 3-160). The parties excused forty-two (42) prospective jurors by agreement, after review of the juror questionnaires.[21] (RR-XVI; p. 168). Thereafter, the Judge conducted his general "voir dire" of the third venire panel wherein he explained certain principles of law.[22] (RR-XVI; p. 12-156). Twenty-two (22) prospective jurors were instructed to return on various dates for individual voir.[23] (RR-XVI; p. 157). On March 7, 2014 six prospective jurors were questioned individually.[24] (RR-XVII; p. 3-145). Appellant entered a plea of guilty upon

[21] Prospective Jurors numbered 189, 241, 242, 243, 244, 245, 247, 248, 249, 250, 251, 252, 254, 255, 256, 258, 259, 260, 261, 264, 266, 267, 270, 271, 272, 273, 276, 277, 278, 279, 280, 281, 282, 284, 285, 287, 288, 293, 294, 295, 301 and 303 were excused by agreement of the parties. (RR-XVI; p. 3; p. 118 and p. 156).

[22] The Court discussed the following principles of law including but not limited to: 1) the presumption of innocence; 2) that a grand jury indictment is no evidence of guilt; 3) that the State has burden of proof and it never shifts to the Defendant; 4) the principle that the State must prove the accused's guilt beyond a reasonable doubt; 5) the accused has the Fifth Amendment Right against self-incrimination and should he exercise that right, no juror may draw an adverse inference there from; 6) explanation of grand jury process; and 7) the elements of the indictment. (RR-XVI; p. 12-156).

[23] Prospective Jurors numbered 246, 257, 262, 263, 265 and 268 were told to return on March 7, at 8:30 a.m. (RR-XVI; p. 157). Prospective Jurors 269, 274, 275, 283, 286 and 289 were told to return on March 7, 2014 at 1:00 p.m. (RR-IV; p. 157). Prospective Jurors numbered 290, 291, 292, 297, 298 and 299 were told to return on March 10, 2014 at 8:30 a.m. (RR-XVI; p. 157). Prospective Jurors 300, 302, 304 and 305 were told to return on March 10, 2014 at 1:00 p.m. (RR-XVI; p. 157).

[24] Prospective jurors 246 257, 262, 263, 265 and 268 were questioned individually. Prospective Juror 246 (Luman Burr) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XVII; p. 32-33). Prospective Juror 257 (Henry Sustaita) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XVII; p. 60 ). Prospective Juror 262 (John Murphy) having qualified to serve, was instructed to return on

arraignment outside the presence of the jury on March 7, 2014. (RR-XVII; p. 146-148). Thereafter, the Court having qualified fifty (50) prospective jurors, recessed until March 24, 2014. (RR-XVII; p. 149). On March 24, 2014, the panel of prospective jurors returned to the Court. (RR-XVIII; p. 5). The Court inquired of the panel whether any circumstances had changed since the their last appearance in Court, "affecting their ability to take the oath and follow the law." [25] (RR-XVIII; p. 5). The Court prepared and presented a *proposed charge* for review by the parties. (RR-XVIII; p. 4). The defense requested the "failure to testify" instruction be removed from the proposed charge (which was granted). (RR-XVIII; p. 3-4). Both sides exercised their peremptory challenges and a jury of twelve (and two alternates) were sworn in and seated.[26] (RR-XVIII; p. 26 and RR-XIX; p. 3).

March 24, 2014 at 8:30 a.m. (RR-XVII; p. 92). Prospective Juror 263 (Judith Zalewski) was excused by agreement of the parties. (RR-XVII; p. 93). Prospective Juror 265 (Kevin Kinlaw) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XVII; p. 115). Prospective Juror 268 (Erika Attleson) having qualified to serve, was instructed to return on March 24, 2014 at 8:30 a.m. (RR-XVII; p. 143).

[25]    The Court re-questioned panel members (re-numbered from 1-50) 2, 14, 24 and 43. (RR-XVIII; p. 7-14). It was determined that prospective juror number 2 (Tameka Hornsby-previously numbered prospective juror 11)who was awaiting cancer tests (tumor benign) remained qualified. (RR-XVIII; p. 7). Prospective juror 14 (Lisa LeBlanc-previously numbered prospective juror 85) who's mother was being treated for cancer was excused by the Court. (RR-XVIII; p. 12); prospective juror 24 (Gaynelle Watkins-previously numbered prospective juror 135)who was on medication for gout was excused by agreement of the parties. (RR-XVIII; p. 14); prospective juror (David Valdez-previously numbered prospective juror 218) who had accepted a new job in Washington D.C., remained qualified. (RR-XVIII; p. 15).

[26]    Prospective Jurors: 7 (Abraham Hernandez -previously prospective juror numbered 35); 9 (Julie Bohannon- previously prospective juror numbered 53); 11 (Darlene

Appellant was arraigned in the presence of the jury and entered a *plea of guilty*. ( RR-XIX; p. 3-4). The Court read the jury charge to the jury, wherein the only verdict option was to find Appellant guilty of Capital Murder. (RR-XIX; p. 5). After deliberations, the jury returned a verdict finding Appellant *guilty* of Capital Murder. (RR-XIX; p. 7).

(v)  PUNISHMENT PHASE OF TRIAL

On March 24, 2014 before hearing evidence, both sides presented opening statement regarding the punishment phase of the trial. (RR-XX; p. 3-22). From March 24, 2014 to March 31, 2014 the State called thirty-two (32) witnesses on punishment. (RR-XX-XV).

*Linda Holly,* was a friend of *Sherry White's* who worked with her bar at the Sweetwater Country Club in the snack bar. (RR-XX; p. 25-26). On Friday May 20, 2011, they were both scheduled to work: Linda the morning shift (from 8:00 a.m. to

---

Greggs previously prospective juror numbered 73); 12 (Henrietta Cavanaugh- previously prospective juror numbered 76); 16 (Scott Huff- previously prospective juror numbered 102); 18 (Tamara Scott- previously prospective juror numbered 117); 23 (Glenn Price- previously prospective juror numbered 134); 25 (Roberto Martinez- previously prospective juror numbered 139); 26 (Alecia Davis- previously prospective juror numbered- 151); 32 (David Murff previously prospective juror numbered 184); 35 (Russell Rice- previously prospective juror numbered 196); and 38 (Cynthia Martinez- previously prospective juror numbered 203) were seated as jurors. (RR-XVIII; p. 26). Prospective Jurors 39 (Gwendolyn Deason- previously prospective juror numbered 207) and 40 (Christina Dakus- previously prospective juror numbered 210) were seated as alternates. (RR-XVIII; p. 26).

3:00 p.m.) and Sherry White the evening shift (from 3:00 p.m. to 8:00 p.m.). (RR-XX; p. 27-28). Sherry White, who was normally prompt and reliable, failed to appear for work at 3:00 p.m. to relieve Linda Holly. (RR-XX; p. 27-28). Linda called Sherry White *several times* on her cell phone and left messages on voice mail, but received no return call. (RR-XX; p. 27-28). Consequently, she had to work a double shift. (RR-XX; p. 27-28). The next day, she spoke to Patricia Robinson (Sherry's cousin) and learned that Sherry White had been found murdered in her home. (RR-XX; p. 32-35).

A cousin *John Elder* (along with police officer *Traci Seals*) found the bodies of Sherry White and her son, Kyle Laverge (also murdered) inside their home at 8914 Ferdinand St., Houston, Texas. (RR-XX; p. 41). The bodies were found around noon, on Saturday, May 21, 2011 at around noon. (RR-XX; p. 41 and p. 64). During the scene investigation, Appellant (who appeared outside at the house was identified as Sherry's boy friend). (RR-XX; p. 89). Appellant was transported by Officer *Jose Garcia* to the homicide division for questioning. (RR-XX; p. 89).

Officer *Sheridan Langford*, (HPD Crime Scene Unit officer) described the evidence gathering process at the crime scene. (RR-XX; p. 91-95). Officer Langford prepared a scene diagram, took photographs and a video (State's Exhibit 168) of the scene at 8914 Ferdinand. (RR-XX; p. 97). State's Exhibits 26-144 (photographs)

16

were admitted into evidence over defense objection.[27] (RR-XX; p. 107). Officer Langford recorded the serial number (State's State's Exhibit 109) corresponding to a missing camera. (RR-XX; p. 135). Lastly, she gave "opinions" regarding forensic aspects of the evidence at the crime scene such as blood spatter, absence of shell casings, recovery of spent projectile (bullet-State's Exhibit 89) and bullet strike inside a pillow (State's Exhibit 88); possible finger prints; blood and possible DNA samples and the physical location of the bodies and wound locations[28]. (RR-XX; p. 106-107; p. 118; p. 121; p. 139 and p. 159).

Homicide Detective *Mathew Brady* conducted a search of an apartment located at 9898 United Drive (Apartment Number 906) with the consent of the owner, *Vicky Alexander.*[29] (RR-XXI; p. 15). Photographs of the scene (State's Exhibits 169-178) and items recovered were admitted without objection. (RR-XXI; p. 16). A camera (depicted in State's Exhibit 179) was recovered from a bag in the bedroom occupied by Appellant. (RR-XXI; p. 19). Also, a receipt (depicted in State's Exhibit 180) for the camera in the name of Sherry White was also found in

---

[27]     The defense objected on grounds of relevance. (RR-XX; p. 107).

[28]     Kyle Laverge's body was found just inside the front door of the house in the living room. (RR-XX-; p. 118). Sherry White's body was found inside the bathroom. (RR-XX; p. 139).

[29]     Detective Brady had received information that Appellant had been staying in a room within Apartment 906. Appellant's sister, Vicky Alexander rented Apartment 906 and lived their with her daughter Ashley Barbideaux and Jasmine Norton. (RR-XXI; p. 80).

the same bag. (RR-XXI; p. 19). State's Exhibits 179 (photo of camera) and 180 (photo of receipt) were admitted into evidence without objection. (RR-XXI; p. 25). Lastly, two suitcases believed to belong to Appellant were seized. (RR-XXI; p. 20). Appellant gave his consent to search the bags. (RR-XXI; p. 22-23). The bags contained clothing, toiletries and a cell phone. (RR-XXI; p. 23). Houston Police Officer Justin Galindo conducted a forensic analysis of the seized camera (State's Exhibit 179). (RR-XXI; p. 32-34). He downloaded 431 digital images from the camera. (RR-XXI; p. 32-34). Ten (10) of those images (identified as State's Exhibits 183-192) enlarged for later identification were admitted into evidence without objection. (RR-XXI; p. 34).

Houston police officer *J. T. Smith* conducted a forensic analysis of a Cricket cell phone owned and consented to by Vicki Alexander. (RR-XXI; p. 42-43). State's Exhibits 193-196 (written consent form; photo of cricket phone and photo of revolver from phone) were admitted without objection. (RR-XXI; p. 40).

*Ashley Barbideaux,* Appellant's niece was close to Sherry White and Kyle Laverge. (RR-XXI; p. 44). Around March 2011, Appellant was released from prison and there was a party on his behalf attended to by his family and Sherry White. (RR-XXI; p. 44-46). Ms. Barbideaux observed Sherry White and Appellant interacting during the party. (RR-XXI; p. 44-46). Shortly afterwards they began dating. (RR-

18

XXI; p. 45). Around the middle of April 2011, Ashley Barbideaux found a kitchen knife with a brown handle under the driver's seat of her Mom's car. (RR-XXI; p. 49). On Friday May 20, 2011, Appellant drove Ashley's mother to work in her car. (RR-XXI; p. 55). Around 10:00 a.m., Appellant returned with her Mom's car. (RR-XXI; p. 55). Ashley recalled Appellant, that morning tried to sell her the camera (depicted in State's Exhibit 179)for $30.00. (RR-XXI; p. 64).

*Jasmine Norton* knew Appellant had been over at Sherry White's house in Vicky's car earlier in the morning of May 20, 2011. (RR-XXI; p. 81-82). Appellant had some "crown royal" with him. (RR-XXI. p. 82). Jasmine and Ashley agreed to get "fucked-up" with Appellant. (RR-XXI. p. 82). Jasmine drove with him to Snappy's grocery store for some "ice." (RR-XXI; p. 82). During the ride Appellant asked Jasmine if she knew anybody that wanted to buy a gun. (RR-XXI; p. 84).

*Christopher Sturdivant*, a homicide investigator interviewed Appellant at the police station after he was detained at the scene on May 21, 2011. (RR-XXI; p. 138-142). The interview was recorded by a digital video device, identified as State's Exhibit 197, admitted into evidence without objection and published to the jury. (RR-XXI; p. 143 & p. 151). The interrogation of Appellant began at 9:42 p.m and ended at 1:48 a.m. (RR-XXI; p. 145 and State's Exhibit 197). Eventually, Appellant admitted to Officer Sturdivant that he had killed both Sherry White and Kyle

19

Laverge. (State's Exhibit 197). Officer Sturdivant believed that their were sufficient corroborating details in Appellant's confession to render it credible. (RR-XXII; p. 9-10). First, Appellant told Officer Sturdivant that the first shot fired at Kyle Laverge was in the bedroom. (State's Exhibit 197). This fact was corroborated by the fired projectile (recovered from inside a pillow) found in the bedroom. (RR-XXII; p. 11). Second, Appellant mentioned a glass of water left on the night stand. (RR-XXII; p. 9-10). This fact was corroborated by observing a glass of water at the scene on a night stand in Sherry White's bedroom. (RR-XXII; p. 9-10). Third, Appellant admitted leaving his watch in the bathroom where Sherry White was found. (Exhibit 197). This fact was corroborated by the recovery of a man's watch of same make and description as described by Appellant. (RR-XXII; p. 13). Fourth, Appellant claimed to have called Sherry White around 6:00 a.m. the morning of May 20, 2011. (State's Exhibit 197). This fact was corroborated by her answering machine recording a telephone call from a number associated with Appellant (Vickie Alexander's apartment) at 6:02 a.m. on May 20, 2011. (RR-XXII; p. 11).

*Jason Oliphant*, a CSU with the Houston Police Department, collected and photographed both Appellant and his shoes[30]. (RR-XXII; p. 49-50 and State's

---

[30]    The shoes (Size eleven Nike tennis shoes) were admitted into evidence without objection. (RR-XXII; p. 57 and State's Exhibit 205).

Exhibits 198-203). He also removed (using a cotton swab and distilled water) perceived blood transfer found on the shoes. (RR-XXII; p. 57).

*Christy Smejkal*, a DNA Analyst with the Harris County Institute of Forensic Sciences, removed biological material and foreign debris from both body's of Sherry White and Kyle Laverge and submitted it to the HPD Crime lab. (RR-XXII; p. 75-79).

*Jennifer Clay*, a DNA Analyst with the Houston Crime Lab, created a DNA profiles (from their known biological material) on both victims Sherry White and Kyle Laverge, John Elder and Appellant. (RR-XXII; p. 92-93). Appellant was not excluded as a contributor to DNA found under the right finger nail of Sherry White, on a cell phone charger location at Sherry White's house, (RR-XXII; p. 100; p. 102).

*Dr. Louisa Flores*, was the Harris County Deputy Medical Examiner who performed both autopsies on the victims. (RR-XXII; p. 134). She testified that the cause of death of Kyle Laverge was "multiple gun shot wounds." (RR-XXII; p. 171 and State's Exhibit 206). She testified that the cause of death of Sherry White was "multiple gun shot wounds and multiple sharp force injuries."(RR-XXIII; p. 81 and State's Exhibit 237).

*Tammy Reed*, a firearms examiner with the Harris County Forensic Examiner's office, identified five (5) projectiles (bullets-State's Exhibits 90, 221, 236, 304 and

21

312) as capable of being fired from eleven different types of hand guns all of the .38 caliber class of firearms. (RR-XXIII; p. 118). She also testified that she had no suspect firearm submitted to her on which to perform a "test fire." (RR-XXIII; p. 117). Lastly, the crime scene had no shell casing recovered. (RR-XXIII; p. 119).

*Robert Ali*, Kyle Laverge's great uncle, testified to fact that Kyle was attending "aviation maintenance" school. (RR-XXIII; p. 133). The school records were admitted into evidence over objection.[31] (RR-XXIII; p. 133 and State's Exhibit 324). *Patricia Robinson*, cousin to Sherry White, identified photographs of Sherry White and Kyle Laverge (State's Exhibits 325-327) admitted into evidence without objection. (RR-XXIII; p. 145). Over objection, she testified that both victims were good people and how difficult it has been dealing with their deaths. (RR-XXIII; p.148).

*Vicky Alexander*, Sherry White's best friend (Appellant's half-sister[32]) described Appellant coming to live with her in March of 2011, upon his release from prison. (RR-XXIII; p. 147-148). Appellant met Sherry White at Vicky Alexander's apartment during a party arranged by his daughter. (RR-XXIII; p. 150). Vicky

---

[31]   Trial counsel's objections was "to relevancy, hearsay and improper victim information." (RR-XXIII; p. 133).

[32]   Appellant and Vicky Alexander had the same father but different mothers.(RR-XXIII; p. 192).

purportedly warned Sherry that Appellant had a "problem" with women. (RR-XXIII; p. 152). In April 2011, Appellant told Vicky that he loved Sherry and he "wished he could marry her." (RR-XXIII; p. 155). Vicky described Appellant as very "controlling, protective, possessive and jealous over Sherry." (RR-XXIII; p. 155-156). Approximately two weeks before the murder, Vicky believed Sherry was ending her relationship with Appellant. (RR-XXXIII; p. 157). The week of May 8, 2011, Appellant went to Port Arthur and stayed with his daughter, Lorraine. (RR-XXIII; p. 159-160). On Sunday May 15, 2011, Sherry White picked Appellant up at the bus station upon his return from Port Arthur. (RR-XXIII; p. 161). He stayed with Sherry at her house until Thursday May 19, 2014.(RR-XXIII; p. 162). On Friday, May 20, 2011, Appellant drove Vicky to work. (RR-XXIII; p. 162). Sherry told Vicky she had made secret plans to go "gambling" out of town that evening. (RR-XXIII; p. 163). When Vicky got off work she could not reach Sherry by telephone. (RR-XXXIII; p. 169). That evening she and Appellant went to a game room. (RR-XXIII; p. 176). On Saturday May 21, 2011, Vicky drove (with Appellant) over to Sherry White's house and learned she and Kyle had been murdered. (RR-XXXIII; p. 181).

*Gloria Freeman*, Appellant's first wife, began dating him when she was fifteen (15) and he was seventeen (17). (RR-XXIV; p. 35). Ms. Freeman knew that

Appellant's sister (Starklyn) had previously died. (RR-XXIV; p. 38). Appellant and Ms. Freeman named their first born daughter Starklyn, after his deceased sister. (RR-XXIV; p. 38-39). After High School, Appellant joined the marines and they moved to Camp Lejuene, North Carolina. (RR-XXIV; p. 40-41). While living at Camp Lejuene, Appellant began physically abusing Ms. Freeman. (RR-XXIV; p. 41). Their second child, La Donna born pre-maturely, died when she was eighteen months old. (RR-XXIV; p. 44). Shortly before her death, Ms. Freeman separated from Appellant and moved back to live with her mother in Port Arthur, Texas. (RR-XXIV; p. 44-45 and p. 48).

*Mark McElvany*, a Deputy Sheriff with Harris County, identified finger prints of Appellant linking him to judgment and sentences in his name (State's Exhibit's 329, 330, 333, 334, 335, 336, 337, 339, 340, 341, 342-admitted without Objection.[33]). (RR-XXIV; p. 68). The judgment and sentences were published to the jury as follows:

| Style of Case & Exhibit | Offense & Date | Sentence & Date |
| --- | --- | --- |

---

[33] State's Exhibits 331, 331A, 332 were admitted over objection, citing *Samudio v. State*, 648 S.W.2d 312 (Tex. Crim. App. 1983).(RR-XXIV; p. 11 and p. 69). The Court reviewed the Harris County District Clerk's Record in Cause Number 351037, specifically an agreement to stipulate and judicial confession and found that Appellant did in fact affirmatively waive his right to a jury trial. (RR-XXVI; p. 128 and Court Exhibit 2).

24

| | | |
|---|---|---|
| State's Exhibit 329-Cause Number 80-CRS-18012; Superior Court; County of Onslow; *State of North Carolina v. Jeffrey Keith Prevost* | Larceny and Possession of Stolen Property- 08/31/1980 | 60 days Jail in Jail- 11/03/1930 |
| State's Exhibit 331- In the 263 District Court of Harris County, Texas; Cause 351037; *State of Texas v. Jeffrey Keith Prevost*; | Burglary of a Building- reduced to Criminal Trespass- 02/26/1982 | 120 days in Jail- 03/01/1982 |
| State's Exhibit 333-In the County Court of Jefferson County; Cause Number 111831; *State of Texas v. Jeffery Keith Prevost*; | Unlawfully Carrying a Weapon - 03/12/1984; | 8 days in Jail- 05/07/1984 |
| State's Exhibit 334-In the County Court of Jefferson County; Cause Number 118016; *State of Texas v. Jeffery Keith Prevost*; | Assault-01/16/1985 | 30 days in Jail- 04/06/1987 |
| State's Exhibit 335- TDC Pen Packet containing; Judgment Adjudication Guilt; Cause 44703; District Court of Jefferson County; *State of Texas v. Jeffery Keith Prevost* | Theft -08/30/1986; | 3 years TDC-09/08/1987 |

25

| | | |
|---|---|---|
| State's Exhibit 336- TDC Pen Packet containing; Judgment; Cause Number 50694; District Court of Jefferson County; *State of Texas v. Jeffery Keith Prevost* | Burglary of a Building- 06/28/1988; | 5 years TDC-08/29/1988 |
| State's Exhibit 337- Criminal Information; charging in the County Court of Jefferson County; Cause Number 144035; *State of Texas v. Jeffery Keith Prevost*; | Criminal Trespass- 08/15/1989; | 15 days in jail- 08/31/1989 |
| State's Exhibit 339- TDC Pen Packet containing; Judgment; Cause Number 53301; District Court of Jefferson County; *State of Texas v. Jeffery Keith Prevost*; | Aggravated Assault; 09/01/1989 | 20 years TDC- 04/09/1990 |
| State's Exhibit 340- Criminal Information; charging in the County Court of Jefferson County; Cause Number 144035; *State of Texas v. Jeffery Keith Prevost*; | Assault Family Violence- 06/27/2005 | 30 days in Jail- 07/25/2005 |
| State's Exhibit 341- Criminal Information; charging in the County Court of Jefferson County; Cause Number 251853; *State of Texas v. Jeffery Keith Prevost*; | Interference with an Emergency Telephone Call-06/27/2005 | 30 days in Jail- 07/25/2005 |

| State Exhibit 342-Jefferson County Sheriff's Office Arrest Records; State Exhibit 343; TDC Disciplinary Records; | Numerous Parole Release Objections by Law Enforcement; | Numerous Violations while in TDC; |
|---|---|---|

(RR-XXIV; p. 70-74).

*John Shannon Davis*; a prosecutor with the Harris County District Attorney's Office and former JAG major in the Military, interpreted Appellant's Military Records (State's Exhibit 346-admitted without Objection). (RR-XXIV; p. 81). State's Exhibit 346, includes Appellant's enlistment papers, medical records, disciplinary records and discharge records. (RR-XXIV; p. 83). The military records indicated Appellant served in the military from 1977 to 1986, reduced by nine hundred (900) days due to AWOL convictions. (RR-XXIV; p. 84-85). Appellant's military records include evidence that he was charged twice with "Desertion," which was reduced to "Absent without official leave" resulting in two "AWOL" convictions. (RR-XXIV; p. 86). Appellant was also found guilty in a special court martial of "Attempted Forgery; Disrespecting an Officer; and Disobeying an non-commissioned officer. (RR-XXIV; p. 91). The punishment imposed was in one hundred and eighty (180) days [reduced to one hundred and twenty-six days (126) in jail] after appeal. (RR-XXIV; p. 91). Appellant was given "a bad conduct discharge" from the military. (RR-XXIV; p. 91-93).

*Sjolanda Brown*, was Appellant's parole officer from June of 2005 until September of 2005. (RR-XXIV; p. 97). Ms. Brown interpreted Appellant's parole records, admitted without objection and published before the jury. (RR-XXIV; p. 98-106 and State's Exhibit 348). Ms. Brown testified Appellant had been paroled and his parole revoked numerous times from 1989 to 2005.[34] (RR-XXIV; p. 112-114). Appellant's last parole was revocation was based on "two misdemeanor convictions" for "Assault Family violence and Interfering with an Emergency Telephone call." (RR-XXIV; p. 110-114). Appellant was sent back to prison (09/01/05) to serve the remainder of a twenty (20) year sentence for "Aggravated Assault." (RR-XXIV; p. 114). On July 12, 2011, Appellant was released on parole again to a half-way house. (RR-XXIV; p. 118). Finally, on March 2, 2011, Appellant discharges his sentence. (RR-XXIV; p. 121). During cross-examination, Ms. Brown stated she did not recall whether Appellant's parole records indicated that during his incarceration (after 2005 and before his parole in 2011) he was treated for "Major Depression" while at the Sky view Unit. (RR-XXIV; p. 120-121).

*Melissa Jackson*, was a parole officer and case manager at the Beaumont House, a half-way house for parolees. (RR-XXIV; 129). Ms. Jackson met Appellant

---

[34] Appellant's parole was revoked on October 28, 1989; January 1, 2003, and June 27, 2005. (RR-XXIV; p. 136).

in December of 2010, when he was paroled to the Beaumont House from TDC. (RR-XXIV; p. 129). She identified State's Exhibit 349 (parole records of Appellant regarding stay at Beaumont House) which were admitted without objection. (RR-XXIV; p. 130). Appellant was assigned to the "clean up" crew at the Beaumont House. (RR-XXIV; p. 133). Appellant's medical history indicated that he was diagnosed with "Major Depression" and treated with "Sinequan" while at the Skyview Unit of TDC from 1991-1993. (RR-XXIV; p. 134 and p. 141). Appellant was referred to "Spindletop" (a mental health facility) for further evaluation and treatment on January 5, 2011. (RR-XXIV; p. 135). During Appellant's residency at the Beaumont House, he violated facility rules by failing to engage in a job search.[35] (RR-XXIV; p. 139).

*Theressal Lorraine Prevost*, Appellant's daughter, was born and grew up in Port Arthur, Texas. (RR-XXIV; p. 153). She was raised by her mother who passed away January 14, 2010. (RR-XXIV; p. 153). During her childhood she had limited contact with her father due to his incarceration. (RR-XXIV; p. 155). Theressal Prevost has two step sisters (Starklyn and Zenobia). (RR-XXIV; p. 157). Appellant

---

[35] Ms. Jackson testified that Appellant was given at least 5 prospective job opportunities per week during his stay at the Beaumont House. (RR-XXIV; p. 139-140). Appellant refused to make any effort to interview for any of the job opportunities.(RR-XXIV; p. 139-140). Appellant purportedly told Ms. Jackson that he did not want a job. (RR-XXIV; p. 139-140). Appellant purportedly stated: "I'm just going to sit here until I'm done and then I'm going to walk out of here." (RR-XXIV; p. 140).

is their biological father, but they do not share the same biological mothers. (RR-XXIV; p. 157). Appellant contacted Theressal, upon his release from the Beaumont House in March of 2011. (RR-XXIV; p. 157-158). She gave Appellant a ride from the Beaumont House to her step-sister's (Starklyn and Zenobia's) apartment. (RR-XXIV; p. 157-158). Appellant lived with them upon his first release from the Beaumont House. (RR-XXIV; p. 159-160). Theressal was close with her Aunt, Vicki Alexander and had met Sherry White and Kyle Laverge. (RR-XXIV; 159-160). At some point, upon learning that Sherry White and Appellant were dating, Theressal Prevost told Sherry that her father had a history of drug abuse. [36] (RR-XXIV; p. 165). In May of 2011, she warned Sherry that he may have relapsed. (RR-XXIV; p. 165). Appellant told Theressal that he loved Sherry White. (RR-XXIV; p. 183). She believe that the death of Appellant's mother, wife and brother, all within the last year (during his incarceration) was a factor in causing his major depression. (RR-XXIV; p. 184). After his arrest for Sherry and Kyle's murder, she would visit him in jail. (RR-XXIV; p. 185-188). He was very sad and would cry a lot. (RR-XXIV; p. 188).

*Jacquelin Eaglin*, testified she was assaulted by Appellant on January 16,

---

[36] Theressal Prevost testified that her mother moved her and her step sister's to a shelter when they were growing up due to her father's drug addiction. (RR-XXIV; p. 168-169). She also witnessed her father assault her mother in 2005. (RR-XXIV; p. 170).

30

1985. (RR-XXV; p. 6). Ms. Eaglin (formerly Jacquelin Buchanan) lived in the same apartment complex across the hall from Dawn Stephenson. (RR-XXV; p. 6-8). Ms. Eaglin observed Appellant trying to force his way into Ms. Stephenson's apartment. (RR-XXV; p. 6-8). She told Appellant Ms. Stephenson was not home and Appellant "exploded" on her. (RR-XXV; p. 6-8). He knocked her to the ground, began choking her and had to be forcibly removed. (RR-XXV; p. 8). Ms. Eaglin thought Appellant was going to kill her. (RR-XXV; p. 8). She sustained injuries that required treatment at the hospital. (RR-XXV; p. 9).

*Vicki Lewis*, and her two daughters were living with Vicki Alexander in her apartment during the spring of 2011. (RR-XXV; p. 13). She first met Appellant during a party hosted at Vicki's Alexander's apartment on his behalf. (RR-XXV; p. 13). Ms. Lewis described an incident around April of 2011, whereby she was physically assaulted by Appellant. (RR-XXV; p. 17). Ms. Lewis did not call the police because she was afraid of Appellant. (RR-XXV; p. 21).

*Ramona Collins*, Appellant's niece was at the apartment in April of 2011 and witnessed Appellant assault Vicki Lewis, by choking her. (RR-XXV; p. 27-28).

*Laura Lee Simmons*, described owning a Blue 1977 Mustang on August 31, 1980. (RR-XXV; p. 34-35). She recalled driving the Mustang to a club that evening called the "500 Club" in Jacksonville, North Carolina. (RR-XXV; p. 35). Ms.

31

Simmons met Appellant at the club that evening. (RR-XXV; p. 35). Around closing time, Ms. Simmons agreed to give Appellant a ride home in her car. (RR-XXV; p. 35-40). After she drives Appellant to his residence, he purportedly gets sexually aggressive with her and is not deterred by her resistance. (RR-XXV; 35-40). Ms. Simmons escapes from her car, flees to a nearby convenience store and calls the police. (RR-XXV; p. 40-41). Thereafter, Appellant without her consent drove off in her car. (RR-XXV; p. 41-42).

*Michael Magby*, was working for Park Inn Hotel near Port Arthur, Texas in July of 1987. (RR-XXV; p. 48-49). He hired Appellant as a general maintenance man for the Park Inn Motel. (RR-XXV; p. 50). On July 3, 1987, Mr. Magby's 1986 Isuzu pick up was stolen. (RR-XXV; p. 51). He also had a gold ring stolen. (RR-XXV; 60-63). Mr. Magby reported to police that another employee had observed Appellant take the truck. (RR-XXV; p. 51). Later, the truck was found parked in a Safeway parking lot with the radio missing. (RR-XXV; p. 53-54). Mr. Magby's gold ring was found in a pawn shop. (RR-XXV; p. 50-54). Appellant did not ever report back to work. (RR-XXV; p. 54).

*Dawn Windon*, grew up in Port Arthur, Texas. (RR-XXV; p. 56). Appellant

and her (known as Dawn Stephenson[37]) dated in the early 80's. (RR-XXV; p. 57). Ms. Windon described being assaulted on at least two occasions by Appellant, first while on a date with him and later after she stopped seeing Appellant. (RR-XXV; p. 66-67 and p. 71-73). Years later, Ms. Windon, was the night audit clerk at the Park Inn Hotel during the time that Appellant was hired as the maintenance man. (RR-XXV; p. 60-63). Ms. Windon was the employee who saw Appellant driving Mr. Magby's stolen truck. (RR-XXV; p. 60-63). She also observed Mr. Magby's gold ring in Appellant's possession. (RR-XXV; p. 60-63).

*Muriel Charles Bell*, went to same High School as Appellant, but met him later. (RR-XXV; p. 93-95). Muriel Bell worked with Dawn Stephenson (now Dawn Windon) at a Popeye's in Port Arthur. (RR-XXV; p. 95). On September 1, 1989, Ms. Bell described being assaulted by Appellant (choked her with a belt to a point of passing out). (RR-XXV; p. 104-105). As a result of this incident, Appellant was convicted of Aggravated Assault and sentenced to twenty (20) years in prison. (RR-XXV; p. 112-113). Thereafter, the State rested. (RR-XXV; p. 114).

From April 1, 2014 to April 3, 2014, the Defense called seventeen (17) witnesses regarding the punishment phase of the trial. (RR-XXVI-XXVIII).

---

[37] Ms. Windon was living across the hall in the same apartment complex from *Jacquelin Eaglin*. (RR-XXV; p 6-8). Appellant was trying to break into Ms. Windon's apartment when Ms. Eaglin confronted Appellant, leading to Appellant's assault of her. (RR-XXV; p. 6-8).

*Trisha Rubero*, worked at Spindletop (a mental health facility for the uninsured) on December 28, 2010. (RR-XXVI; p. 8). Ms. Rubero met Appellant at the facility on that day and reviewed his initial paper work. (RR-XXVI; p. 10). She noted that Appellant had a previous diagnosis of Major Depression and had recently lost his wife and mother. (RR-XXVI; p. 10). Appellant returned on January 5, 2011 for an initial intake appointment. (RR-XXVI; p. 10-11). Appellant returned on January 12, 2011 for a follow-up treatment session. (RR-XVI; p. 12).

*Jeffrey Demuth*, worked at Spindletop as a intake counselor and met Appellant on January 12, 2011. (RR-XXVI; p. 18). Mr. Demuth testified that his intake comment regarding Appellant reflected the following: Appellant was 51 at the time of intake interview. (RR-XXVI; p. 19). Appellant reported he had been hospitalized at Skyview in 1993. (RR-XXVI; p. 19). Appellant was diagnosed with "Major Depression and treated with Doxepin." (RR-XXVI; p. 19). Appellant last received medicine in 1995. (RR-XXVI; p. 19). Appellant reported a suicide attempt in the early 1980's. (RR-XXVI; p. 19). Appellant reported that he had recently been paroled from prison and was scheduled to be discharged from the Beaumont Center in 49 days. (RR-XXVI; p. 19). Appellant reported that his wife and mother had recently passed away. (RR-XXVI; p. 19-20). Appellant reported he was having difficulty coping. (RR-XXVI; p. 20). Mr. Demuth entered a diagnosis that Appellant

34

was experiencing an "adjustment disorder" and "bereavement." (RR-XXVI; p. 20-21). However, Mr. Demuth did not believe Appellant's condition met the criteria for referral to a psychiatrist, so he did not do so. (RR-XXVI; p. 21-22).

*Alesia Bean*, met Appellant in 1982 when she was seventeen (17). (RR-XXVI; p. 32). She and Appellant had a daughter that they named Zenobia. (RR-XXVI; p. 31). The relationship lasted about a year and a half, but they have remained in contact and she still loves Appellant. (RR-XXVI; p. 31-33 and p. 43). Ms. Bean described Appellant as a good father who loved Zenobia very much. (RR-XXVI; p. 36). On cross-examination, Ms. Bean admitted that their relationship included physical abuse at times by both parties. (RR-XXVI; p. 41-43).

*Thomesa Lewis Hollins*, is Appellant's half-sister. (RR-XXVI; p. 44). Appellant was thirteen (13) when she was born. (RR-XXVI; p. 44). Appellant and Ms. Hollins have the same biological mother, *Betty Prevost Jones*. (RR-XXVI; p. 45). Appellant and her were raised by their maternal grand parents. (RR-XXVI; p. 46). During her childhood, Ms. Hollins had chronic asthma and lung failure that required her to be home schooled. (RR-XXVI; p. 46-47). She had to be in an oxygen tent both day and night. (RR-XXVI; p. 47). Appellant acted as her home teacher and would spend time in the oxygen tent with her. (RR-XXVI; p. 48). She

recalls Appellant played football[38] in High School and was very popular. (RR-XXVI; p. 49). Ms. Hall stated that the family has a history of mental health issues, both she and her mother were hospitalized for depression. (RR-XXVI; p. 50). After Appellant lost his daughter, La Donna he wasn't the same. (RR-XXVI; p. 51). Appellant was a loving and nurturing father. (RR-XXVI; p. 51-52). Upon Appellant's latest parole release , they would attend church together. (RR-XXVI; p. 53). Appellant's father, Richard Senegal went to prison "several times." (RR-XXVI; p. 54). Ms. Hollins met Sherry White and believed she was "very sweet." (RR-XXVI; p. 55). She observed them together and believed Appellant "loved her." (RR-XXVI; p. 55). Ms. Hollins knew Appellant had a history of drug and alcohol abuse. (RR-XXVI; p. 56). Appellant regretted that he was unable to attend his wife (Theressal -Lorraine's mother), his brother and Betty Jones' funerals due to his incarceration. (RR-XXVI; p.62 and p. 71). She also believed he had difficulty adjusting to society upon his discharge from parole. (RR-XXVI; p. 56). After the murders, Appellant cried a lot and was remorseful. (RR-XXVI; p. 60).

*Clarence Callahan*, is a minister at the "Zion Temple Church of God and Christ" located at 822 East Twelfth Street in Port Arthur, Texas. (RR-XXVI; p. 95).

---

[38]     Appellant's athletic career in High School was described by Ms. Hall as follows: "He was really good at football. So he made the *little circle* a lot. It was a big thing." (RR-XXVI; p. 49.

He met Appellant as a member of his congregation about fifteen years ago. (RR-XXVI; p. 96). He would have dinner at Appellant and Theressal's house on occasion. (RR-XXVI; p. 96-97). Appellant and Sherry White attended his church on at least one occasion. (RR-XXVI; p. 98-99). Reverend Callahan observed during the service on that occasion, Appellant was deeply weeping. (RR-XXVI; p. 98-99). On cross-examination, Reverend Callahan admitted that on August 11, 1999, he wrote a letter to the parole board on Appellant's behalf. (RR-XXVI; p. 100 and State's Exhibit 361).

*Hershelle Prevost*, is Appellant's first cousin and twelve (12) years his junior. (RR-XXVI; p. 101-107). He observed Appellant interact with his children in 2011 and believed he was an attentive father. (RR-XXVI; p. 109).

*Starklyn Logan*, is Appellant's daughter from his relationship with Gloria Ann Freeman. (RR-XXVI; p. 110-111). Appellant helped out with her children and treated them well. (RR-XXVI; p. 116). After the murders she visited Appellant in jail and he cried and was sad. (RR-XXVI; p. 116-117). Ms. Logan stated she loves her father. (RR-XXVI; p. 117).

*Dinisha Joseph*, is Appellant's sister and twelve years his junior. (RR-XXVI; p. 121). She was raised by her mother and grand mother Ora Sandies. (RR-XXVI; p. 122). Appellant was her hero growing up and acted like a father figure to her. (RR-

37

XXVI; p. 123-124). Shortly before the murder of Sherry White, Ms. Joseph over heard a telephone conversation Appellant had with Sherry White. (RR-XXVI; p. 131-132). Afterwards, Appellant returned to Houston and looked sad and rejected. (RR-XXVI; p. 133).

*Rynisha Jones*, is Appellant's niece (daughter of Dinisha Joseph). (RR-XXVI; p. 147). She described her uncle as "loving and caring." (RR-XXVI; p. 148).

*Kevin Jones*, is Appellant's younger step brother by eight (8) years. (RR-XXVI; p. 156). They have the same mother (Betty Jones) but different fathers. (RR-XXVI; p. 157). Neither Appellant or Mr. Jones knew or saw much of their biological fathers growing up. (RR-XXVI; p. 158-159). Appellant was a father figure to Mr. Jones. (RR-XXVI; p. 159). After the death of Starkyln, their mother (Betty Jones) had a mental break down and spent time in a State Mental Hospital. (RR-XXVI; p. 161). Betty Jones would bring men home with her that she met in clubs. (RR-XXVI; p. 163). Often the men would get in physical fights with Appellant. (RR-XXVI; p. 164). Mr. Jones recalled one occasion where his mother got angry and fired a pistol in Jeffrey's direction in order to break up a fight between Appellant and her man friend of the moment. (RR-XXVI; p. 165). Mr. Jones recalled Appellant changed after his daughter (LaDonna) died. (RR-XXVI; p. 166-172). Appellant had anger issues after her death and his time in the military. (RR-XXVI; p. 173).

38

*Lane Herkoltz*, a former employee of the Texas prison system, described the security and classification system applicable to offender's convicted of Capital Murder. (RR-XXVII; p. 13-36). Mr. Herkoltz reviewed Appellant's previous prison records from his three previous prison terms, including his disciplinary records. (RR-XXVII; p. 35-36 and State's Exhibit 339). Mr. Herkoltz described the Texas prison system as a zero tolerance institution. (RRXXVII; p. 35-36). A prison inmate has no right to refuse a lawful direct order from a prison correctional officer. (RRXXVII; p. 36). A disciplinary violation will become a permanent part of the inmate's prison records. (RRXXVII; p. 36-37). During Appellant's first and second prison terms he had no disciplinary reports or problems. (RRXXVII; p. 36-38). During Appellant's third trip, he had some disciplinary problems. (RR-XXVII; p. 38). Specifically, on January 18, 1995 he failed to obey and order to be quiet in the main hallway. (RR-XXVII; p. 39). On May 31, 1995 he pled guilty to "possession of contraband, namely tobacco" and was restricted to his cell for thirty (30) days. (RR-XXVII; p. 39). On April 30, 1995 he was disciplined for using profanity and sentence to thirty day commissary restriction. (RR-XXVII; p. 40). On August 31, 1991 he was reprimanded (no punishment) for being in someone else's cell. (RR-XXVII; p. 43). On May 21, 1991 he was given a fifteen (15) day commissary restriction for possession of contraband (six pieces of colored construction paper). (RR-XXVII; p.

39

43). On May 11, 1991 he was given a thirty (30) day commissary restriction for possession of contraband (radio without proper paper work). (RR-XXVII; p. 45). On April 6, 1991 he admitted to a rule violation and was punished by fifteen day (15) commissary restriction and four extra duty hours. (RR-XXVII; p. 45). On January 22, 1991 he was given a thirty (30) day commissary restriction for being in the wrong cell. (RR-XXVII; p. 45). On August 13, 1990 he was punished by a fifteen day cell restriction for refusing an two orders to return to his cell. (RR-XXVII; p. 47). On July 3, 1990 he violated a posted rule by "failing to return a shorts and socks" and was given a commissary restriction. (RR-XXVII; p. 49). On August 16, 1990 he was disciplined for lying to a correctional officer and received a ten day commissary restriction. (RR-XXVII; p. 49-50). On January 3, 1996 he possessed contraband and was given a thirty day commissary restriction. (RR-XXVII; p. 50). On May 13, 1995, he exposed his penis to a correctional officer and was given a forty-five day commissary restriction. (RR-XXVII; p. 51).

*Gilbert Vilano*, is a prison guard at the Jester Unit of the Texas Prison System. (RR-XXVII; p. 108). He worked at the maximum security McConnell Unit for two years. (RR-XXVII; p. 108). At the McConnell Unit, many inmates are serving Life sentences without parole. (RR-XXVII; p. 108). The maximum security units have cameras everywhere, monitoring activity 24/7 in the cells blocks, hallways,

enclosed areas where the officer's operate the doors, the rec yards and in the day room. (RR-XXVII; p. 108). Officer Vilano met Appellant as an inmate around 2008. (RR-XXVII; p. 114). Appellant worked for Officer Vilano in the kennel's where the dogs (bloodhounds) are cared for. (RR-XXVII; p. 115). Officer Vilano recalled only one instance[39] where he had any disciplinary problems with Appellant during the period that Appellant was under his supervision. (RR-XXVII; p. 118).

*Luis Lopez*, is a prison guard at the Lopez Unit of the Texas Prison System. (RR-XXVII; p. 138). Officer Lopez met Appellant when they were both at the Segovia Unit. (RR-XXVII; p. 139). Appellant worked for Officer Lopez for about one year, during that time he had no disciplinary problems with Appellant. (RR-XXVII; p. 139-140).

*Eric Trevino*, worked at the Lopez and Segovia Units of the Texas prison system as a psychotherapist. (RR-XXVII; p. 146-147). He met Appellant in February of 2010 for grief counseling relative to his depression. (RR-XXVII; p. 149-150). Appellant had lost three family members in a three (3) week time span. (RR-XXVII; p. 150-151). Appellant was polite, courteous and respectful toward Mr. Trevino. (RR-XXVII; p. 151). At no time did Mr. Trevino feel threatened by

---

[39] Appellant and another inmate who also worked in the kennels got into a verbal altercation about a work issue.

41

Appellant. (RR-XXVII; p. 151-152).

Daniel Prevost, Appellant's first cousin, was close with Appellant growing up. (RR-XXVIII; p. 8). *Daniel Prevost*, believed that Appellant was changed by the trauma associated with the deaths of his step-sister *Starklyn* and his daughter *LaDonna*, both of whom he was very close with. (RR-XXVIII; p. 14).

*Xenobia Green*, is Appellant's daughter. (RR-XXVIII; p. 25). She described Appellant's sadness that she witnessed upon visiting him in the Harris County, Jail. (RR-XXVIII; p. 32).

*Gilda Kessner, Phd.,* is a clinical psychologist. (RR-XXVIII; p. 38). Dr. Kessner spoke with Appellant for many hours, spoke with family members, reviewed his medical, school, military and prison records in order to complete a psychological profile of Appellant. (RR-XXVIII; p. 40-43). Appellant was the first child born to a teenage mother, out of wedlock to Richard Senegal (an absent older father) who had a criminal convictions for possession of heroine and homicide. (RR-XXVIII; p. 43-44). Appellant was raised by his (step-father- Pete Jones' parents) and in an environment that was not supportive. (RR-XXVIII; p. 44). His mother, when around would dress him up in girls clothes when he would show emotion, boys don't cry. (RR-XXVIII; p. 45-46). Appellant's siblings were fathered by different men, making discipline confusing and inconsistent. (RR-XXVIII; p. 46). The grandmother

ran a club called the "Ship Channel." (RR-XXVIII; p. 46). This exposed Appellant to a lot of Adult Entertainment. (RR-XXVIII; p. 46-47). Appellant was thirteen (13) years old when Starklyn died. (RR-XXVIII; p. 47). This had a huge impact on Appellant and he was ill equipped psychologically to deal with this loss. (RR-XXVIII; p. 52). Appellant's mother was treated at Rusk State Hospital as an in-patient in 1973 and 1976 for mental illness. (RR-XXVIII; p. 53). Appellant joined the Marines when he graduated from High School. (RR-XXVIII; p. 58). He did he basic training in San Diego, California and his advanced training in North Carolina. (RR-XXVIII; p. 58-59). Appellant Gloria Freeman in High School, she got pregnant and moved out to North Carolina. (RR-XXVIII; p. 60). Starklyn was born in June of 1978, about one month after they were married. (RR-XXVIII; p. 60). The drinking age in North Carolina was eighteen, Appellant is single when he first arrives and is partying a lot. (RR-XXVIII; p. 60-61). When Starklyn arrives, they move to the married quarters on base. (RR-XXVIII; p. 60-61). Gloria doesn't know anyone and it is difficult for her. (RR-XXVIII; p. 60-61). She gets in a car accident that damages her pelvis and moves back to Texas . (RR-XXVIII; p. 62). Appellant leaves to check on Gloria in the hospital in Texas without his Commander's permission and is charged with being AWOL. (RR-XXVIII; p. 62). LaDonna is born in June of 1979, with severe birth defects and died eighteen months later. (RR-XXVIII; p. 62-65).

43

This is another tragic event in Appellant's life which leads to his mood disorder of depression. (RR-XXVIII; p. 66). Appellant did not receive proper medical treatment for his depression so he self-medicates with alcohol and drugs. (RR-XXVIII; p. 66-68). During the early 80's Appellant experiences the loss of his second child, is abusing drugs and alcohol to treat his depression, is working sporadically, which leads to a series of misdemeanor convictions, the auto theft and then Aggravated Assault case leading to his twenty year prison sentence. (RR-XXVIII; p. 75). Dr. Kessner opined that Appellant developed an abnormal neediness and dependency for a secure relationship[40], that lead him to fall in love with Sherry White. (RR-XXVIII; p. 78). When this abnormal "neediness and dependency" is perceived by Ms. White, she pulled back. (RR-XXVIII; p. 77-78). Appellant, who was not being treated for his mood disorder, had "low energy, low motivation, and a fatalistic attitude about his future" reacted to her withdrawal with extreme violence. (RR-XXVIII; p. 85-86). It was Dr. Kessner's opinion that the events that happened in Appellant's life acted as a trigger for the "rage and violence" causing this offense are unlikely to be re-created in a prison environment. (RR-XXVIII; p. 94-95). Thereafter, the Defense rested. (RR-XXVIII; p. 174). The State rested and closed.

---

[40]    Appellant's early childhood shaming, no secure attachment to either parent, exposure to domestic violence, leading to the a feeling of no safety or security.

(RR-XXVIII; p. 174).

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

APPELLANT WAIVES ORAL ARGUMENT

## <u>QUESTIONS PRESENTED</u>

WHETHER THE STATE'S FAILURE TO FILE WRITTEN NOTICE OF "INTENT TO SEEK THE DEATH PENALTY" VIOLATES *DUE PROCESS* UNDER FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION?

WHETHER THE STATE'S FAILURE TO FILE WRITTEN NOTICE OF "INTENT TO SEEK THE DEATH PENALTY VIOLATES *DUE COURSE OF LAW* UNDER ARTICLE ONE, SECTION NINETEEN OF THE TEXAS CONSTITUTION?

WHETHER THE STATE'S FAILURE TO FILE WRITTEN NOTICE OF "INTENT TO SEEK THE DEATH PENALTY" AS REQUIRED BY LAW WAS FUNDAMENTAL ERROR?

WHETHER THE TRIAL COURT ERRED BY FAILING TO FIND TEXAS CODE OF CRIMINAL PROCEDURE ARTICLE 37.071 UNCONSTITUTIONAL?

WHETHER THE TRIAL COURT ERRED BY FAILING TO FIND TEXAS PENAL CODE ART. 19.02-19.03 UNCONSTITUTIONAL?

WHETHER THE EXCUSAL OF PROSPECTIVE JUROR 77 (WILLIAM HERED) BASED ON THE STATE'S CHALLENGE FOR CAUSE (OVER DEFENSE OBJECTION) WAS ERROR BY THE TRIAL COURT?

WHETHER THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR A MISTRIAL AFTER THE ADMISSION OF IMPROPER AND PREJUDICIAL EXTRANEOUS OFFENSE EVIDENCE?

WHETHER THE TRIAL COURT ERRED IN DENYING APPELLANT'S

45

MOTION FOR A MISTRIAL AFTER THE ADMISSION OF VICKI
ALEXANDER'S UNRESPONSIVE AND PREJUDICIAL TESTIMONY?

WHETHER THE TRIAL COURT ERRED IN DENYING APPELLANT'S
MOTION FOR A MISTRIAL AFTER THE ADMISSION OF THOMESA
HOLLIN'S UNRESPONSIVE AND PREJUDICIAL TESTIMONY?

WHETHER THE TRIAL COURT ERRED IN DENYING APPELLANT'S
MOTION FOR A MISTRIAL AFTER THE ADMISSION OF AN
IMPROPER AND PREJUDICIAL QUESTION BY THE PROSECUTOR?

## POINT OF ERROR ONE

THE STATE'S FAILURE TO FILE WRITTEN NOTICE OF "INTENT TO
SEEK THE DEATH PENALTY VIOLATES DUE PROCESS UNDER THE
FIFTH AND  FOURTEENTH AMENDMENT OF THE UNITED STATES
CONSTITUTION

## POINT OF ERROR TWO

THE STATE'S FAILURE TO FILE WRITTEN NOTICE OF "INTENT TO
SEEK THE DEATH PENALTY VIOLATES DUE COURSE OF LAW
UNDER ARTICLE ONE, SECTION NINETEEN OF THE TEXAS
CONSTITUTION

## FACTUAL SUMMARY

The index of in Volume One (I) of the Clerk's Record in this cause does not

list by *caption heading* any entry entitled  "State's Notice of Intent to Seek the Death

Penalty" nor the page number of such a document on a certain page within the Seven

Volumes of Clerk's documents (comprising of over fifteen hundred pages). (CR-I; p.

1-9). Further, a computer search (in PDF format) using the search terms "State's

Notice of Intent to Seek the Death Penalty" results in  "no document found." (CR-I-

VII). A careful review of all Seven (7) volumes of the clerk's record has revealed no such document exists under this cause (per Appellant counsel's diligent search of the record in this cause) as required by Articles 34.04; 35.15; 35.16 and 37.071 of the Texas Code of Criminal Procedure.[41] [CR-I-VII; p. 1-1529].

## ARGUMENT AND AUTHORITIES

Historically, the Texas Code of Criminal Procedure § 1.14 (1973) provided:

> "... No case in which the State seeks the death penalty shall be tried until 15 days after such notice is given..." *Ex parte Watkins*, 489 S.W.2d 617, 618 (Tex. Crim. App. 1973).

Currently, Texas Code of Criminal Procedure § 37.071 section 2) (a) (1) provides "...in which the State seeks the death penalty..." and 37.0711 section 3(a)(1) provides "...If a defendant is tried for a capital murder in which the state seeks the death penalty..." Further, Texas Code of Criminal Procedure § 35.25 (2012) provides...in *capital cases* in which the state's attorney has announced that he will not...*seek the death penalty...*. See *Sorola v. State*, 769 S.W.2d 920, 922 (Tex. Crim. App. 1989). Last, "due process" and "due course of law" consideration require that a defendant be given *written notice*

---

[41] Further, the record does not reflect that the Defense entered any "objection" to the failure of the State to file a written notice of "Intent to seek the death penalty" so any error (other than fundamental error) has not been preserved for review. *Clark v. State*, 365 S.W.3d 333 (Tex. Crim. App. 2012).

of any punishment enhancements. For example, when the State will seek an affirmative finding that a deadly weapon was used or exhibited during the commission of the charged offense. *Smith v. State*, 2012 Tex. App. LEXIS 10056 (Tex. App. Fort Worth Dec. 6, 2012) citing *Brooks v. State*, 847 S.W.2d 247, (Tex. Crim. App. 1993). The notice requirement is firmly rooted in fundamental precepts of *due process* and *due course of law*. See *Ex parte Patterson*, 740 S.W.2d 766 (Tex. Crim. App. 1987). This Court noted[42] in *State ex rel. Lykos v. Fine*, 330 S.W.3d 904 at page 906 (Tex. Crim. App. 2011) "Mr. Green has been charged with the capital murder of Tina Vo, and the *State has given notice of its intent to seek the death penalty*." This Court has also noted that "...a capital murder indictment reads when the State seeks the death penalty reads exactly the same as when the State does not seek the

---

[42]     Although it appears to be the practice in Harris County to do so, this Court did not cited any controlling statute or authority *requiring* the State to file written notice of Intent to Seek the Death Penalty in *State ex rel. Lykos v. Fine*, 330 S.W.3d 904 at page 906 (Tex. Crim. App. 2011) or in *Smith v. State*, 297 S.W.3d 260 at page 266 (Tex. Crim. App. 2009) wherein the Court noted that "on August 16, 2005, the State served its "Notice of Intent to Seek the Death Penalty." Other counties (Collin County) in Texas follow the practice to file written notice of Intent to Seek the Death Penalty. See *Bell v. State*, 2012 Tex. App. LEXIS 8995 (Tex. App. Eastland Oct. 31, 2012). In Federal Court, the United States Code § 3593 (a) requires the government to file written notice of Intent to Seek the Death Penalty. See *United States v. Webster*, 162 F.3d 308 (5th Cir. 1998).

death penalty." *State ex rel. Lykos v. Fine* supra. Here, the failure of the State to file written notice of the Intent to Seek the death penalty violated Appellant's right to due process under the federal constitution and his right to due course of law under the Texas Constitution.

## POINT OF ERROR THREE

THE STATE'S FAILURE TO FILE WRITTEN NOTICE OF "INTENT TO SEEK THE DEATH PENALTY" AS REQUIRED BY LAW WAS FUNDAMENTAL ERROR

## ARGUMENT AND AUTHORITIES

It is common practice for the State to file written notice of its intent to seek the Death Penalty at some point before trial and independent of the indictment. *State v. ex rel Lykos v. Fine,* 330 S.W.3d 904 (Tex. Crim. App. 2011). *Fundamental error*[43] is error so egregious and created such harm that the accused is deprived of a fair and impartial trial. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). Here, the indictment in this case in Cause 1414421, was returned on January 15, 2014, per the Harris County District Clerk's file stamp and signature of the foreman of the grand jury of the 351st

---

[43]     Trial counsel filed no written objection nor does an oral objection appears in the record. (CR-I-IV and RR-I-XXXIX).

49

District Court, Rhonda Lowe[44]. (CR-I; p. 12). The return of the indictment

was thirty-three (33) days before the beginning of the Jury selection phase of

trial on February 17, 2014. (RR-III; p. 3-4). At least one lower Court has

found written notice of other penalty enhancements to be "firmly rooted in

fundamental precepts of due process and due course of law." *Byrd v. State*,

2008 Tex. App. LEXIS 6630, 2008 WL 4053000 (Tex. App. Fort Worth Aug.

29, 2008). Arguably, the State's failure to provide written notice of the Intent

to Seek the Death Penalty failure is so egregious and created such harm that

Appellant was deprived of a fair and impartial trial.

## POINT OF ERROR FOUR

THE TRIAL COURT ERRED BY FAILING TO PRECLUDE THE DEATH PENALTY AS A SENTENCING OPTION AND FAILING TO FIND TEXAS CODE OF CRIMINAL PROCEDURE ARTICLE 37.071 UNCONSTITUTIONAL UNDER AUTHORITY OF *JONES V. UNITED STATES* ET. AL.

## ARGUMENT AND AUTHORITIES

It is unconstitutional for a legislature to remove from the jury the

assessment of facts that increase the prescribed range of penalties to which a

---

[44] At least one earlier indictment had been filed (per notation on current indictment indicated "Re-Indict of 1309319."). (CR-I; p. 12).

50

criminal defendant is exposed and those facts must be established by proof beyond a reasonable doubt. *Jones v. United States*, 526 U.S. 227 (1999). In *Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court held that the rule of *Apprendi v. New Jersey,* applies to capital cases, "Where a sentence of death is authorized only upon the finding of certain facts, those facts operate as the functional equivalent of an element of a greater offense." The Sixth Amendment's jury trial guarantee thus required that the Arizona death penalty statute's aggravating factors be treated as elements, "Because Arizona's enumerated aggravating factors operate *as the functional equivalent of an element of a greater offense*, the Sixth Amendment requires they be found by a jury beyond a reasonable doubt." *Ring v. Arizona*, 536 U.S. 584 (2002). Here, under the Texas scheme as provided by Article 37.071, the jury should be instructed that they must find beyond a reasonable doubt the "absence of any mitigating facts." This court has previously rejected this argument distinguishing facts in aggravation of punishment from facts in mitigation of punishment. *Perry v. State*, 158 S.W.3d 438 (Tex. Crim. App. 2004). To the extent that *Perry v. State*, 158 S.W.3d 438 (Tex. Crim. App. 2004) and other cases are authority against this argument, Appellant requests this Court reconsider this issue.

51

# POINT OF ERROR FIVE

## THE TRIAL COURT ERRED BY FAILING TO FIND TEXAS PENAL CODE ART. 19.02-19.03 UNCONSTITUTIONAL

## ARGUMENT AND AUTHORITIES

In *Mullaney v. Wilbur,* 421 U.S. 684 (1975), the United States Supreme Court held the Due Process clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case. Further, in *Coker v. Georgia,* 433 U.S. 584 (1977) held the death penalty constitutes cruel and unusual punishment under the Eight Amendment where there is no proportionality between the crime and the punishment. Here, trial counsel Motion attacked the Constitutionality of the Texas Capital Punishment scheme, arguing that under the statutory definition of murder [where Texas law makes voluntary manslaughter a mitigating fact at punishment instead of an element of a lesser included offense of voluntary manslaughter] and therefore under *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and under a proportionality review the intentional killing of two individuals in the same transaction, but under circumstances of sudden passion based on adequate

52

cause redefines the elements of the offense of murder by characterizing the element as a factor that only bears on punishment mitigation. To the extent that *Perry v. State*, 158 S.W.3d 438 (Tex. Crim. App. 2004) and other cases are authority against this argument, Appellant requests this Court reconsider this issue.

## POINT OF ERROR SIX

EXCUSING PROSPECTIVE JUROR 77 (WILLIAM HERED) BASED ON THE STATE'S CHALLENGE FOR CAUSE (OVER DEFENSE OBJECTION) WAS ERROR BY THE COURT

## ARGUMENT AND AUTHORITIES

A venire member is challengeable for cause if he has a bias or prejudice against the defendant or against the law upon which either the State or the defense is entitled to rely. TEX. CODE CRIM. PROC. art. 35.16(a)(9). The proponent does not meet this burden until he has shown that the venire member understood the requirements of the law and could not overcome his prejudice well enough to follow the law. *Feldman v. State*, 71 S.W.3d 738 (Tex. Crim. App. 2002). When a venire member's answers are ambiguous, vacillating, unclear, or contradictory, a reviewing Court will give particular deference to the trial court's decision, however reversal is warranted for clear abuse of discretion. *Colburn v. State*, 966 S.W.2d 511, 517 (Tex. Crim. App.

53

1998). Here, arguably the trial court abused it's discretion in granting the

State's challenge for cause. Although prospective juror William Hered at times

gave unclear answers, he stated unequivocally on more than one occasion that

he understood the requirements of the law and would follow it. The following

examples demonstrate this:

> Q: By Mr. Goodhart- Can you participate in such a way where you would have to vote according to the evidence and a person might die, or are you telling us that you cannot do that?
>
> A: By Mr. Hered- It would be really hard, but I think if I was fully convinced during the trial, that I could vote in either way as long as I believed it. (RR-VIII; p. 101.)
>
> Q: By Mr. Goodhart-.As I told you earlier, some people just tell us: Look, I just found this person guilty of capital murder, I'm always going to find the person a future danger just because of the facts of the case. Would you do that?
>
> A: By Mr. Hered- It would depend on the case for me. Depending -- you mentioned there's a whole bunch of different capital murder cases. And I think depending on which kind of case that was, my answer would change. (RR-VIII; p. 106).
>
> Q: By Mr. Tanner- Now, would you be able to follow your oath and give a correct answer as to Special Issue No. 1 based on the evidence?
>
> A: By Mr. Hered-That evidence thing, again, those extreme cases you mentioned, I think it would be pretty easy. (RR-VIII; p. 114).
>
> Q: By Mr. Tanner- If the State proved that to you, those two things should be answered "yes" and "no," knowing that it would lead to the death penalty, would you answer those "yes, no" knowing that, or would you violate your oath and change one of the answers to assure that the

person gets life in prison?

A: By Mr. Hered- If I was convinced on either one of those, like I said in one of those extreme cases, then I would answer those questions truthfully regardless of the final outcome. (RR-VIII; p. 117).

Q: THE COURT- So, in that circumstance, if you have found that he is a future danger, then the question is: Is there mitigation sufficient to change from death to life. Would you answer that question truthfully based on the evidence presented to you?

A: By Mr. Hered- Yes. (RR-VIII; p. 118).

Viewing these responses it is arguable that he would follow the law over his preferences in favor of life without parole. Accordingly, the Court abused it's discretion in granting the State's challenge for cause.

## POINT OF ERROR SEVEN

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR A MISTRIAL AFTER THE ADMISSION OF IMPROPER AND PREJUDICIAL EXTRANEOUS OFFENSE EVIDENCE

## FACTUAL SUMMARY

During the testimony of Vicky Alexander the following exchange took place:

Q:     Do you have personal knowledge of an incident where everything was removed from Theressal's house?

A:     Yes.

Q:     Explain that. What did you see?

55

A:     Jeffrey removed everything from her house.

Q:     And when we say...

MR. TANNER:     For the record may we take this witness on voir dire?

THE COURT:     Okay.

MR. TANNER:     Thank you.

BY MR. TANNER:     You're saying that Jeffrey removed everything from the house? Did you see that with your own eyes?

A:     Sir?

Q:     I'm sorry?

A:     What did you say?

Q:     Did you see that with your own eyes, him remove everything from the house?

A:     No.

MR. TANNER:     Judge, we're going to ask that be stricken from the record and the jury be asked to disregard that comment.

THE COURT:     Sustain the objection. Instruct the jury to disregard the last statement by the witness.

MR. TANNER:     For the record, we move for a mistrial.

THE COURT:     That will be denied. (RR-XXIII; p. 202-203).


# STANDARD OF REVIEW

56

This Court reviews a trial court's denial of a motion for mistrial for an abuse of discretion. *Archie v. State*, 340 S.W.3d 734, 738-39 (Tex. Crim. App. 2011). Thus, this Court must uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Marchbanks v. State*, 341 S.W.3d 559, 561 (Tex. App.—Fort Worth 2011, no pet.). A mistrial is necessary in extreme circumstances when the prejudice caused by an improper question and answer is incurable. *Whitney v. State*, 396 S.W.3d 696(Tex. App.—Fort Worth 2013, pet. ref'd) holding that a mistrial is appropriate when an error is so prejudicial that expenditure of further time would be futile.

## ARGUMENT AND AUTHORITIES

The Texas Rules of *Evidence* provide the basic framework for analysis regarding whether an *extraneous offense* is admissible. *Evidence* is "relevant" that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the *evidence*." *TEX. R. EVID. 401*. "All relevant *evidence* is admissible, except as otherwise provided by . . . these rules . . . . [E]vidence which is not relevant is inadmissible." *TEX. R. EVID. 402*. *Rule 404* provides: "*evidence* of other crimes, wrongs or acts is not admissible to prove the

57

character of a person in order to show that he acted in conformity therewith."

*TEX. R. EVID. 404(b)*. *Evidence* of "other crimes, wrongs or acts" may be admissible if it has relevance apart from its tendency "to prove the character of a person in order to show action in conformity therewith." *TEX. R. EVID. 404(b)*. *Jackson v. State,* 320 S.W.3d 873 (Tex. App.—Texarkana 2010, pet. ref'd). Evidence of extraneous offenses also may be admitted during the punishment phase if the trial court deems the evidence relevant to sentencing. *See* Tex. Crim. Proc. Code Ann. art. 37.07 § 3(a)(1) (Vernon 2005). When evidence of an extraneous offense is used in the punishment phase of trial for the limited purpose of assessing punishment, the evidence must prove beyond a reasonable doubt that the defendant committed the act alleged. *Id*. If such evidence is introduced, the trial court must give the jury an instruction regarding the reasonable doubt standard of proof. *Id*. *§ 3(b)*; *Huizar v. State, 12 S.W.3d 479, 484 (Tex. Crim. App. 2000).* In general an instruction to disregard usually cures prejudice from improper reference to extraneous offense. *Ovalle v. State,* 13 S.W.3d 774 (Tex. Crim. App. 2000). Testimony referring to *extraneous offenses* can be rendered harmless by an instruction to disregard, unless it is so clearly calculated to inflame the minds of the jury and is of such a nature as to suggest the impossibility of withdrawing the

58

impression produced. *Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992); *Huffman v. State*, 746 S.W.2d 212, 218 (Tex. Crim. App. 1988). Here, although the Court gave the jury "an instruction to disregard" Vicki Alexander, testimony regarding Appellant's extraneous offense evidence was arguably, "clearly calculated to inflame the minds of the jury" and was intended to so prejudice the jury that it was impossible to withdraw the impression produced- that Appellant has a history of preying on women. The Court should have granted a mistrial.

### POINT OF ERROR EIGHT

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR A MISTRIAL AFTER THE ADMISSION OF VICKI ALEXANDER'S UNRESPONSIVE AND PREJUDICIAL TESTIMONY

### FACTUAL SUMMARY

During the testimony of *Vicky Alexander* the following exchange took place:

BY MS. EMMONS: Let me show you what has been marked for identification purposes as State's Exhibit 328. Without saying what it is do you recognize this?

A:    Yes, I do.

Q:    And how do you recognize it?

A:      It's Jeffrey's letter he wrote to me.

Q:      Do you recognize his handwriting?

A:      Yes.

Q:      And you recognize that to be Jeffrey Prevost's handwriting?

A:      Yes.

Q:      And is that the original letter?

A:      Yes, it is.

BY MS. EMMONS:      Your Honor, at this time I would offer State's Exhibit 328, tender it to Defense Counsel any Objections.

MR. TANNER:      No objections.

THE COURT:      State's Exhibit 328 is admitted.

MS. EMMONS:      Permission to publish?

THE COURT:      Alright. (RR-XXIII; p. 207-209).

Q:      ....So you received this letter, what did you think?

A:      You want me to tell you what I honestly think

Q:      Yes, ma'am.

MR. TANNER:      Excuse me. I'm going to object, as relevancy Judge.

THE COURT:      Over-ruled. You may answer the question.

60

A:      When I received the letter, I was very, very, angry. And when he put in the letter he knew he was going to get the death penalty, and I said: I want you to get it too.

MR. TANNER:      I'm going to object that...that's non-responsive.

THE COURT:      Sustained.

MR. TANNER:      ...And we would ask the Court to now instruct the jury to disregard her comment about what she wants to happen to the Defendant.

THE COURT:      The jury will disregard the last statement by the witness.

MR. TANNER:      ...We move for a mistrial.

THE COURT:      That will be denied. (RR-XXIII; p. 208-209).

## ARGUMENT AND AUTHORITIES

When it is apparent that an objectionable event at trial is so *emotionally inflammatory* that curative instructions are not likely to prevent the jury being unfairly prejudiced against the defendant*,* a motion for mistrial should be granted. *Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App.1992).  In determining whether an exception exists to the general rule that an instruction renders the error harmless, this Court  must look at the particular facts of each case. *Williams v. State*, 643 S.W.2d 136 (Tex. Crim. App. 1982).  For example, in *Robinette v. State*, 816 S.W.2d 817 (Tex. App.--Eastland 1991, no

61

pet.), the elicited testimony that the accused had bragged about killing a police officer, was so inflammatory that a jury instruction to disregard did not cure the error. The court remanded to the trial court for a new trial. In *Hill v. State*, 817 S.W.2d 816 (Tex. App.– Eastland 1991, pet. ref'd) the State's witness testimony (that informant was dealing heroin) was so inflammatory as to be *uncorrectable* by a judge's order to the jury to disregard the statement. The cause was remanded for a new trial. Here, Vicky Alexander's testimony (interpreting Appellant's Letter- State's Exhibit 328) and describing it's content,[45] was equally uncorrectable by a judge's order to the jury to disregard her statement. This evidence (suggesting Appellant knows he will get the death penalty and his own sister wants him to get it as well) is so *emotionally inflammatory* that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant. The trial court should have granted a mistrial.

## POINT OF ERROR NINE

THE TRIAL COURT ERRED IN DENYING
APPELLANT'S MOTION FOR A MISTRIAL AFTER

---

[45]   Ms. Alexander testified: "When I received the letter, I was very, very, angry, and when he put in the letter *he knew he was going to get the death penalty...I want you to get it too*."(RR-XXIII; p. 208-209). Appellant's letter actually stated: "...I'm sure *they will seek the death penalty...*It is only a matter on time before *they execute me or send me to a mental hospital*." (State's Exhibit 328; RR-XXXII; p. 94).

62

## THE ADMISSION OF THOMESA HOLLINS
## UNRESPONSIVE AND PREJUDICIAL TESTIMONY

### FACTUAL SUMMARY

During the testimony of *Thomesa Hollins* the following exchange occurred:

MS. EMMONS: ...And what did she do to try to protect herself, to show that she wasn't scared of him?

A: She shot at him.

Q: Because she felt she had to protect herself, right?

A: It all depends on the situation.

MR. TANNER: I'm going to object the prosecutor stating the reasoning on why she thinks the Defendant's mother shot a gun at him.

THE COURT: Sustained.

MR. TANNER: And ask that the jurors be instructed to disregard the last statement.

THE COURT: The jury will disregard the last statement by the prosecutor.

MR. TANNER: Thank you. And we move for a mistrial.

THE COURT: That's denied. (RR-XXVI; p. 79).

### ARGUMENT AND AUTHORITIES

Appellant cites the same authority as previously listed under *Point of*

*Error Eight.*   Here, the prejudicial and improper  question by the prosecutor, implying that Appellant's mother was in fear of Appellant and therefore shot at him with a gun, is arguably so inflammatory as to be *uncorrectable* by a judge's order to the jury to disregard the statement.  It is equally possible Appellant's mother had anger management and impulse issues leading her to fire a gun at her son.  The Court should have granted a mistrial.

## POINT OF ERROR TEN

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR A MISTRIAL AFTER THE ADMISSION OF A PREJUDICIAL QUESTION BY THE PROSECUTOR

## FACTUAL SUMMARY

During the testimony of Lane Herkoltz the following exchange occurred:

BY MR. GOODHART:  Q: "....I think they teach ethics now.

BY MR. HERKOLTZ:   A:  They do.

BY MR. GOODHART:  Q:    They reason for that is because of bribery.

BY MR. HERKOLTZ:   A:  Correct.

BY MR. GOODHART:  Q: There's a high incidence of bribery of prison guards, correctional officers, inside TDC because you're 47th out of 50 States..."

BY MR. CORNELIUS:  I'm going to object to this as not being relevant to the issue in the case, your Honor.

64

THE COURT:          Sustained.

BY MR. CORNELIUS: And ask the jury be instructed to disregard it.

BY MR. GOODHART:   Judge, it goes to the credibility of this witness as to his underlying thought process as to how he just classified this man, I mean, if he doesn't understand what is going on in the prison system, how can he tell us, this jury what the classification system is.

THE COURT:          I sustained the objection. Ask another question.

BY MR. CORNELIUS: And ask the jury be instructed to disregard it.

THE COURT;          The jury will disregard the last statement by the prosecutor.

BY MR. CORNELIUS: Move for a mistrial.

THE COURT;          Denied. (RR-XXVII; p. 64-65).

THE COURT:          The jury will disregard the last statement by the prosecutor.

## ARGUMENT AND AUTHORITIES

Appellant cites the same authority as previously listed under *Point of Error Eight*. Here, the prejudicial and improper question by the prosecutor, implying that the Texas Prison System is so corrupt due to bribery, that Appellant's is a greater danger to prison guards because the system of classifying inmates is not reliable, is arguably so inflammatory as to be

65

*uncorrectable* by a judge's order to the jury to disregard the statement. The

Court should have granted a mistrial.

## **CONCLUSION**

Appellant's case should be reversed and remanded for a new trial.

Respectfully submitted.

__/s/_____
DOUGLAS M. DURHAM
State Bar No: 06278450
2800 Post Oak Blvd. Ste. 4100
Houston, Texas 77056
(832) 390-2252 Telephone
(832) 390-2350 Fax
APPELLANT'S COUNSEL
JEFFREY KEITH PREVOST

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Appellant's Brief was served on Assistant Criminal District Attorney by hand delivery at the Court of Appeals mailbox for the Harris County District Attorney on this 5th day of February 2015.

_/S/_____
DOUGLAS M. DURHAM

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that pursuant to Tex. R. Of App. Procedure 9.4(1)(3),

that the number of words in this Brief is less than 37,500 words to wit: 16,959

words, in compliance with Tex. R. Of App. Procedure, 9(i)(2)(B) on this the

5th  day of February 2015.

_____/S/_____
DOUGLAS M. DURHAM